HOGG v. HOAG et al.

HOFFMAN et al. v. HOGG.

(Circuit Court, S. D. New York. January 3, 1901.)

1. EQUITY—SCOPE OF CROSS BILL.

In a suit to obtain the appointment by a court of equity of a trustee in place of one deceased, the court may entertain a cross bill by beneficiaries of the trust for the purpose of ascertaining and enforcing their rights in the trust fund, and on such cross bill it may require an accounting by the representatives of the deceased trustee, or others connected with the trust, and compel restitution of any part of the fund shown to have been illegally diverted; but such cross bill is auxiliary to and dependent upon the original suit, and cannot be extended to matters not connected with the fund which the court is called upon to administer, although arising out of the transactions in connection with which the trust was created.

2. TRUSTS—DUTIES AND LIABILITIES OF TRUSTEE.

A syndicate was formed for the purpose of purchasing certain stocks and real estate owned by one of the members, at agreed prices. Some of the members contributed their proportion of the required fund, which was placed in the hands of one of their number as custodian. An executive committee was also created. After a time the seller insisted that the purchase should be completed or the option surrendered, and the custodian paid over to him the fund collected. The seller conveyed to the custodian a portion of the property, which at the option price exceeded in value the amount he received, and also a large amount of the stocks, subject to a pledge thereof to secure an indebtedness which the contributions due from the remaining members of the syndicate were more than sufficient to meet. The project was subsequently abandoned, and nothing further was done towards carrying out the plans of the syndicate. Held, in a suit by members of the syndicate against the legal representatives of the seller and the custodian after their deaths, that it must be presumed, in the absence of evidence to the contrary, that the custodian paid over the money by direction of the executive committee, and with the knowledge and consent of all the persons concerned, and, there being no evidence of bad faith, that neither he nor the seller who received it could be charged with liability for its misappropriation, under the circumstances.

3. SAME.

Subsequently the custodian was made a formal trustee to receive and disburse the funds of the syndicate and hold title to its property. The trust declaration provided that the holders of a majority in interest of the syndicate certificates should in every respect govern the trust. Held, that under such provision it did not devolve on the trustee to take measures for the protection of the property rights of the syndicate by enforcing payment from the delinquent members and paying the incumbrances subject to which he held the stocks, or by compelling a conveyance of the remaining property, which he could not do without paying the remainder of the purchase price, and that there was no equity in a claim by members of the syndicate that his estate should be charged with liability on account of his failure to take such action as for a breach of his duty as trustee.

**4. JOINT-STOCK COMPANIES—SYNDICATE ASSOCIATION—MUTUAL DEALINGS AND LIABILITIES OF MEMBERS.**

A syndicate was formed to purchase real estate and stocks owned by one of the members; each member agreeing to furnish a certain proportion of the funds necessary, their interest in the syndicate to be evidenced by certificates. A part only contributed their shares, and the money paid in was paid to the seller who conveyed the property; certain of the stocks, however, being subject to a pledge made by him to secure an indebtedness, which the contributions due from the remaining subscribers to the syndicate agreement were sufficient to pay, so as to give the syndicate a clear title. Such contributions, however, were not paid, and certificates covering the interests of the nonpaying subscribers were subsequently issued to the seller. *Held*, that by accepting such certificates he assumed towards the syndicate the position and liabilities of the defaulting members, and that his failure to pay in the amounts due from them to enable the syndicate to redeem the stocks pledged, by reason of which they were lost to it, rendered him subject to an action for an accounting in favor of the other members on the winding up of the affairs of the syndicate.

**5. SAME.**

The fact that after receiving such certificates he held the controlling interest in the syndicate, and that the syndicate agreement provided that the majority in interest should control its management, could not avail him to avoid his individual obligations to the syndicate, either as seller of the property or as certificate holder.

In Equity. Bill for appointment of a trustee in place of a deceased trustee, and cross bill by beneficiaries of the trust to require an accounting and a distribution of the trust fund.

P. Lowrey, for complainant.

Charles E. Hughes, for defendants Coe.

Thomas N. Rhinelander, for cross complainants.

Francis K. Pendleton, for cross complainant Hoffman.

WALLACE, Circuit Judge. George S. Coe, trustee under a trust created by a declaration and conveyances executed in March, 1888, having died, one of the beneficiaries brought this action to procure the appointment by the court of another trustee to administer the trust. The defendant Hoffman was permitted to intervene as assignee of a part interest in the trust fund, and, besides answering, to file a cross bill alleging delinquencies and misconduct on the part of the trustee, aided and abetted by the complainant and one of the defendants, whereby the fund was impaired, and asking an accounting therefor, and that the amount found recoverable be paid in, and distributed as part of the trust fund. Wilmer and Bronson, who were also permitted, as assignees for a part interest in the trust fund, to intervene as defendants, have united as complainants with Hoffman in the cross bill.

The trust was the outgrowth of the transactions of the Oregon Pacific Syndicate. April 2, 1887, certain parties, 12 in number, consisting of individuals and firms, among whom were Hogg, Bentley, Hazard, White, Coe, Jones, and Rhinelander, by an instrument of that date associated themselves together as members of the Oregon Pacific Syndicate. Hogg was the promoter and president of the Oregon Pacific Railroad Company, a corporation organized in 1880

for the purpose of constructing and operating a railroad from Ya- quina Bay, Or., to Boise City, Idaho, a distance of 640 miles. · The company had created an issue of $15,000,000 first mortgage bonds, of which $10,000,000 had not been negotiated. Hogg was also the president of the Pacific Construction Company, and the owner of its capital stock. He was also the owner of 15,000 of the 25,000 shares of the capital stock of the Oregon Development Company. The construction company was a corporation which had been organ- ized to build the railroad for the railroad company, and was the fiscal agent of the latter in negotiating its bonds and providing the means for constructing the road. The development company owned a line of steamships, terminal properties, and coal and timber lands. Its interests were affiliated with those of the railroad company, and the value of its properties depended mainly upon the completion of the railroad. Hogg was also the owner individually of extensive real-estate interests. It was supposed that the assets of the de- velopment company and of the construction company and Hogg's real estate would be greatly enhanced in value when the railroad was built. The syndicate was organized to finance the railroad com- pany, and thereby secure the building of the road, and to acquire the·stock of the construction company, a majority of the stock of the development company, and the real estate of Hogg; the expec- tation of its members being that a profit could be made by negoti- ating the bonds of the railroad company sufficient to pay for the other properties. The syndicate agreement provided for purchasing the bonds in lots of $1,000,000 at a time for 90 cents on the dol- lar; for purchasing the stock of the construction company for $100,- 000, the 15,000 shares of the stock of the development company at $25 per share, and Hogg's real estate for about $426,000. It con- templated a purchase of all the bonds, and that not more than $1,000,000 or $2,000,000 would have to be advanced, as the bonds could be sold for their face value, and the sale of the first lot would supply the fund for the purchase of the next, and the 10 per cent. profit would pay for the other properties. The prices fixed upon the properties of Hogg were supposed to represent not more than six-tenths of their then actual value. By the terms of the syndicate agreement the subscribers became severally responsible for a definite proportion of the fund to be contributed, and entitled to a pro rata share of the profits. Eight of the subscribers agreed to contribute one-tenth part each of the necessary fund, and four to contribute one-twentieth part each. The agreement provided that payment for the properties other than the bonds might be made in cash or the bonds of the railroad company, or by interests in the syndicate, in such manner or proportion as might thereafter be agreed upon. It also provided that the holdings in the syndicate should be repre- sented by certificates from the syndicate to the individual members, that the property of the syndicate should be placed in such custody as the syndicate should determine, and that Hogg, besides the share of profits to which he should be entitled as a subscriber, should also be entitled to four-tenths of all the net profits arising otherwise than from the sale of the bonds. In June and July, 1887, calls were

made by the syndicate upon the members for funds for the purchase of two lots of bonds. One of the members, a subscriber for a one-tenth part, did not respond. Hogg and Bentley did not pay their calls, but they acquired $300,000 of the bonds from the construction company ($200,000 for Hogg and $100,000 for Bentley) by an arrange-ment between the syndicate and the construction company, the exact nature of which does not appear. It is apparent, however, that the syndicate did not become liable to the construction company for these bonds, or, if it did, that such liability was a temporary one, and was discharged by some subsequent arrangement between it, Hogg, and the construction company. The syndicate purchased $1,-500,000 of the bonds from the construction company at 90 cents on the dollar, and distributed them to the members of the syndicate who had paid their calls, charging them the face value of the bonds. The syndicate, however, did not receive the $30,000 profit on $300,000 of the bonds which it would have made if Hogg and Bentley had paid their calls in cash. Of the profits derived from the sale of this lot of bonds by the syndicate, $146,000 was loaned to the construc-tion company; that company pledging to the syndicate, as collateral, bonds of the railroad company in double the amount. Thereafter no further purchases of bonds were made by the syndicate. Ap-parently, the bonds could not be marketed as had been expected, and the purchase of more bonds was abandoned. In March, 1888, Hogg notified the syndicate that, if it proposed to purchase his prop-erties, it must elect to do so promptly. To do this it was necessary to raise $826,000; that being the amount of the purchase price, in-terest, etc. Calls were made upon the members for the payment of their respective proportions. The majority in interest responded, but some were indisposed to participate further. In the meantime the trust deeds conveying Hogg's real estate to the syndicate, vest-ing the title in Coe as trustee, together with a declaration of trust by Coe, were prepared, were executed by Hogg and Coe, respectively, and were left in the hands of the counsel for the syndicate. These instruments bear date March 20, 1888, but they were in fact exe-cuted at a somewhat later date. At the same time Hogg trans-ferred to the syndicate (Coe, custodian) 940 shares of the stock of the development company, and gave to the syndicate an order on Percy R. Pyne for the delivery of the whole of the stock of the con-struction company. The members who responded to the calls were Hogg, Coe, Hazard, and White, who paid in a one-tenth part, or $82,600, each, and Bentley, Jones, and Rhinelander, who paid in a one-twentieth part, or $41,300, each. Subscribers for nine twentieth parts did not respond to the call. The payments were made at dif-ferent dates between March 31, 1888, and June 16, 1888, and amount-ed altogether to $454,426. As the moneys were paid in, they were paid over to Hogg. The deeds from Hogg to Coe, trustee, conveyed 40,720 acres of land in one tract, and eight other tracts or parcels, and, so far as appears, conveyed perfect title. The declaration of trust by Coe recited that the lands, premises, and other property which were the subject of the trust therein declared had been con-veyed to Coe, as trustee, by Hogg, by several deeds of the same date,

"for the benefit and protection, in large measure, of a syndicate of certain parties" who had advanced the money for the purchase; that Hogg was to retain under the trust fund four tenths of the profits of the trust, and the remaining six tenths should be set apart for the benefit of the syndicate; that the moneys paid by the syndicate should be regarded as a charge upon the property, to be repaid from the proceeds of sales; that the trustee should issue certificates of interest in profits to the parties entitled thereto, and for the convenience of distribution the four tenth parts to which Hogg was entitled, and the six tenth parts to which the syndicate parties were entitled, should altogether and as a whole be taken to represent 1,000 shares, and the trustee should issue to Hogg a certificate for 400 shares, and to the syndicate parties certificates for 600 shares; that the holders of a majority in interest of the said certificates should in every respect govern the trust; and that the trustee should have full power and authority to lease or sell the trust property, and execute good and sufficient deeds of conveyance for the same, but should not execute any of the powers vested in him, except with the consent of the majority in interest of the certificate holders. The instrument contained this further recital:

"It is further understood that the trust property includes 15,000 shares of the Oregon Development Company and 990 shares of the Pacific Construction Company. The voting power of all this stock is to be in the hands of the trustee and said T. Egenton Hogg."

Inasmuch as only eleven twentieths of the sum payable to Hogg for the properties had been paid in by the members, including the two twentieths paid by Hogg himself, on May 22, 1888, Coe, as trustee, executed a further declaration of trust, reciting the fact, and that Hogg was still entitled to nine twentieth portions of said trust properties, as a beneficiary under said agreement, and, upon request, to a certificate therefor. June 29, 1888, a certificate was issued to Hogg by the trustee for 270 shares, being nine twentieths of the 600 shares of the syndicate in the trust property. It is inferable that this declaration was executed for Hogg's protection pending the nonpayment of calls by the defaulting members, and the certificate was issued when it had been definitely ascertained that these members would not pay in unless compelled to. July 17, 1888, certificates were issued to the other beneficiaries for their respective shares.

The only property formally transferred to Coe as trustee was the real estate conveyed by Hogg. The syndicate, however, had obtained, besides the 940 shares of the stock of the development company mentioned, the equitable title to 12,600 other shares, transferred to the syndicate, and held by Coe as trust custodian. At the time when the syndicate waived payment from Hogg and Bentley upon the calls for the bond purchase it received from Hogg a delivery order on Percy R. Pyne for 12,600 shares of the development company's stock. This stock, as well as the stock of the construction company, was owned by Hogg individually, and had been pledged by him to Pyne as collateral security on loans made to the construction company for the benefit of the railroad company. The order for the delivery of the 12,600 shares of the development company's stock

was dated June 15, 1887, and directed Pyne to deliver the shares to Coe, as trust custodian, on payment of the sum of $300,000 borrowed November 11, 1886, and interest. The order on Pyne for the stock of the construction company directed the delivery of the shares upon the payment to Pyne of $150,000 borrowed March 31, 1887, with interest. It would seem, although the fact is not entirely clear, that when the declaration of trust was executed the loans from Pyne had been reduced to $300,000. The syndicate had also acquired in the summer of 1887 1,452 shares of the development company's stock, and had exchanged all but 145 shares with the construction company. The certificates for the 940 shares and the 145 shares of the development company's stock, and the orders of Hogg upon Pyne for the delivery of the pledged stocks, were among the documents found, after the death of the trustee, in a tin box, to which reference will hereafter be made. So far as appears, the trustee never acquired any title to the stocks of the development company, other than such as is evidenced by these orders and certificates. There was, however, a memorandum in Coe's handwriting (supposed to have been made by him prior to June 18, 1888), found among the documents in the tin box, indicating that he understood that the 1,370 shares of the development company's stock which had been exchanged in the summer of 1887 with the construction company were still the property of the syndicate; that there was but $300,000 owing to Pyne upon the loan, for which the 12,600 shares of the development company's stock and the whole stock of the construction company were then in pledge to him; and that, upon the transfer by Hogg of 8 shares of the development company's stock, he would have all the stocks required for the trust.

None of the real estate conveyed to Coe was disposed of after he became trustee, and no profits or receipts in any form were derived from it by the trustee. At the time of his death he had disbursed for the syndicate all the moneys received by him as custodian and as trustee, except the sum of $321, and had that balance on hand. Within two or three years after the creation of the trust the enterprise upon which the adventure of the syndicate had been founded collapsed. Notwithstanding upward of $10,000,000 had been raised by the sale of the bonds of the railroad company, only 142 miles of single-track road was ever completed. The railroad did not pay operating expenses, passed into the hands of a receiver in 1890, and was finally sold under a decree in foreclosure for a sum insufficient to pay the indebtedness incurred in operating it by the receiver. The properties of the development company, irrespective of their prospective value as incident to the completion of the railroad, were not at any time equal in value to the amount of the obligations of that company, nor were the assets of the construction company. When the scheme of building the railroad failed, the stocks of both these companies became worthless. The development company passed into the hands of a receiver. The construction company had made some small payments upon the loans made to it by the syndicate. No member of the syndicate ever received any dividend or return upon his investment other than the bonds distributed on

the first call. The real estate conveyed by Hogg likewise proved to be of insignificant value.

During the existence of the syndicate its affairs were managed by an executive committee consisting of five of its members. Hogg, Bentley, and Halstead were members of this committee, and it does not appear who the other members were. Bentley was the secretary and treasurer, and had the custody of all the documents and correspondence. A record seems to have been kept of the formal proceedings of the committee, but, except the minutes of one meeting, at which it was voted to make a loan to the construction company, there is no evidence in the record in respect to the proceedings or transactions of this committee, except such as may be spelled out from certain documents and papers found in a tin box after Coe's death, and the testimony of Bentley. This box had been in the possession of Bentley as secretary and treasurer, and was kept by him at the office of the railroad company until April, 1893. At that time he became critically ill, and for about two years was unable to transact business. During his illness the box was taken from the office of the railroad company, and subsequently, but how long after does not appear, was delivered to Coe, and Coe labeled it, "Geo. S. Coe, Trustee, Oregon Pacific Syndicate," and retained it until his death. Coe died May 3, 1896. When the box was found after his death many of the papers which were in it while it was kept by Bentley were missing. What they were, what became of them, or how they were abstracted or misplaced, does not appear. Until Coe became trustee under the deeds and declaration of trust he acted as "trust custodian" for the syndicate. In that capacity he seems to have been merely the custodian of the funds of the syndicate, and the repository of the legal title of its property. The funds were deposited in his name, and paid out by his checks. He kept a syndicate check book, and the deposit entries in this book and the check stubs show all the receipts and disbursements of the syndicate. Hogg died after the present suit had been brought, but before his testimony as a witness had been taken. Bentley was examined as a witness in regard to the transactions of the syndicate, but, owing to the many years that had elapsed since they occurred, or to the impairment of his memory by his illness, his testimony is of little value in throwing light upon the history of the syndicate. No other witness was examined in respect to the transactions of the executive committee or of the syndicate, and what took place can only be inferred from the meager documents and papers found in the tin box.

The defendants who have filed a cross bill allege that Hogg, Bentley, and Coe misappropriated the funds of the syndicate, and seek to compel a winding up of the trust, and a restitution to the trust fund of all the moneys paid to Hogg, contributed by the syndicate in the spring of 1888. They also assert a liability on the part of Hogg, Bentley, and Coe to account for the profit of $30,000 which should have been realized by the syndicate from the $300,000 of bonds obtained by Hogg for himself and Bentley. Their rights, however, so far as they are properly the subject of the present controversy, are only those which arise from their relations as beneficiaries of

the trust created by the trust deeds, and the declaration of trust executed March 20, 1888. The bill was filed to obtain the appointment of a trustee in the place of the deceased trustee of that trust. The cross bill can only be maintained for the purpose of enforcing the rights of the parties to the trust fund. If the trustee, or any other persons, have depleted or diverted any part of the fund, or upon any ground are accountable for money or property which legally or equitably belongs to that fund, the beneficiaries may resort to a cross bill, compel restitution, and ask that the fund be administered in its integrity. The office of a cross bill is to obtain relief touching the merits of the original bill. As auxiliary to and dependent upon the original suit, such a bill is a proceeding to procure the complete determination of a matter already in litigation. Ayers v. City of Chicago, 101 U. S. 187, 25 L. Ed. 838. It should not introduce new and distinct matters not embraced in the original bill, as they cannot properly be examined in the suit, but constitute the matter of an original, independent suit. Ayres v. Carver, 17 How. 595, 15 L. Ed. 179. These rules should be strictly applied in this case, because the present cross bill cannot be sustained as an original bill, as the requisite diversity of citizenship between the parties does not exist to confer jurisdiction upon this court. It follows that the controversy must be limited to a determination of the rights of the parties to the fund of which Mr. Coe became trustee; and any inquiry concerning his dealings, or those of Hogg and Bentley, with the original syndicate, is extraneous, except so far as it may be necessary in order to ascertain the rights of the parties to the trust fund. The members of the syndicate and the beneficiaries of the trust fund in controversy are not identical. The trust fund is the property, or the proceeds of the property, that vested in Coe as trustee. It comprehends the lands conveyed by Hogg, and the stocks of the development and construction companies which were transferred by him, or which, if not transferred, nevertheless belonged to the fund, in the contemplation of a court of equity. The beneficiaries of this fund are not the members of the original syndicate, but are those who continued to co-operate in the adventure,—the certificate holders under the trustee. All of those who failed to respond to the second call abandoned the enterprise. If any profits were derived, or should have been derived, from the dealings of the syndicate in the bonds of the railroad company, those are in no sense a part of the fund in controversy. They belong to the other members of the syndicate as well as to those who became certificate holders under the trust, and all issues in respect to them are extraneous to the present suit. It is, therefore, unnecessary to inquire whether any profits should have been credited to the syndicate on account of the $300,000 of bonds acquired by Hogg and Bentley.

The syndicate members who contributed towards the purchase of the properties of Hogg and became certificate holders under the trustee did so upon the understanding that 15,000 shares of the stock of the development company and all the shares of the stock of the construction company, exclusive of the qualifying shares, as well as the real estate of Hogg, were or were to become a part of the

trust fund. If that understanding was defeated by any breach of duty or misconduct of the trustee, he became answerable to make it good. If it was defeated by any breach of obligation or misconduct by Hogg or by Bentley, these persons likewise became answerable to make it good.

The moneys contributed in the spring of 1888 were not paid to Coe as trustee of the formal or express trust, but they were paid to the syndicate, and received by Coe as its custodian. Except that they were advanced for the special purpose of enabling the syndicate to exercise the option and to acquire the properties of Hogg, they were contributed as were the other moneys paid in to that syndicate, and Coe had no responsibility in respect to them except as trust custodian. They were to be dealt with like its other funds, but were to be used only for the purpose of purchasing Hogg's properties. The first question to be considered is whether these moneys were improperly dealt with by Coe, Hogg, and Bentley, or either of them. If they were, it is because they were paid over to Hogg before he had transferred the stocks of the construction company and the development company to the syndicate in such manner as to vest a valid legal title in them, free from incumbrances. What was the situation at the time? The syndicate had already acquired from Hogg properties which, upon the basis of the option price, including interest, considerably exceeded in value the amount of the payments. Upon that basis the real estate was worth about $343,000, and the equity in the stocks of the two companies was worth about $150,000. The real estate had been conveyed to the trustee, and the syndicate had the equitable title to the stock of the construction company and 12,600 shares of the stock of the development company, subject to the payment of Pyne's loan, and the legal title to 940 more shares of the stock of the latter company. The syndicate had not entered into any formal contract with Hogg for the purchase of the properties, and he was in a position to entitle him to insist upon payment in full as a condition of completing the transfer of his properties. He was insisting, properly, that the option to purchase his properties must be exercised or abandoned. It is apparent that the members of the syndicate were anxious to have the option secured, and believed it to be of great value. It appears from the letters of S. S. Sands & Co., who were representing the interests to which the cross complainants have succeeded, that Hogg's properties were understood at the time to be worth more than double the option price, and that he was then offered by other parties $1,500,000 for the development company's stock and $360,000 for one of the parcels of real estate. It was impossible for the syndicate to pay the full purchase price, and presumably the alternative was presented either to abandon the option and return the moneys contributed to the several members, or use the moneys so as to secure the option. There is no reason to suppose that the members who had paid in were not aware of the situation, and no evidence that they did not sanction what was done. It was not then known that the other members would not ultimately respond for their shares. Those members were liable, and could have been compelled to re-

spond. The mutual promises to contribute were a valid consideration for the contract of each member, and the syndicate could have enforced contribution from each to the extent of his proportionate share. It appears from the memorandum of Coe to which reference has been made that after the moneys had been paid over to Hogg the question of admitting the defaulting members was still under consideration. Probably the executive committee deemed it advisable to complete the purchase as far as practicable. If Hogg insisted upon being paid the moneys, $82,600 of which had been paid in by himself, there was nothing untenable in his position, and if the syndicate had not complied the option would have been lost. That Coe and Bentley believed it to be desirable that the moneys be paid to Hogg and the rights of the syndicate in the option be preserved as far as practicable, and that they acted in good faith, is indicated by the circumstance that their own contributions were paid over, as were the contributions of the others. It is fair to infer that Hogg considered himself entitled to the money as an equivalent of the property which he had already transferred, and that the money was paid to him because the justice of his position was recognized; the question of obtaining from the defaulting members the sum necessary to redeem the pledged stock and pay for the residue of the development company's stock being left open for future action. Under such a state of circumstances, it must be assumed that the executive committee of the syndicate were acting within their implied authority in making the payments. In the absence of any element of bad faith in the transaction, it was not one of which the members of the syndicate had any legal or equitable right to complain.

It is possible that some arrangement had been made between the executive committee or the syndicate, Hogg, the construction company, and Pyne, by which all the stocks coming from Hogg to which the syndicate had not acquired the legal title were to be released to the syndicate. The relations of the parties were apparently such as to render an arrangement of this kind feasible, as Hogg was practically the construction company, owning all the stock, and Pyne held as collateral for the loans, besides the stock which Hogg had pledged as surety, securities of the principal debtor of the market value of several times the amount of the loans. There is, however, no evidence of any such arrangement. Pyne, as well as Hogg and Coe, were dead when the proofs in the cause were taken, and, from the omission of either party to examine any member of the executive committee except Bentley, it may be inferred that, if there were any other living witnesses, they, like Bentley, had forgotten what transpired.

In any view of the case, Coe did not violate any duty in disbursing the funds of the syndicate, unless he paid them to Hogg without the sanction of the executive committee. It is not to be presumed, in the absence of proof, that he violated his instructions, and there is no evidence in the record tending to show that he did.

Bentley's connection with the transaction, if he participated at all in it, was only as a member of the executive committee; and neither he nor any member of that committee incurred any legal re-

sponsibility for acts done in good faith within the scope of its authority.

It remains to inquire whether Coe was derelict in any of his duties as a trustee of the formal trust, in consequence of which the trust fund was impaired. If he was, it was because he did not take proper measures to obtain the shares of the development company not already transferred by Hogg to the syndicate, and to redeem those which he had transferred and the stock of the construction company from the pledge to Pyne, and thus obtain perfect title to all the shares which were to constitute part of the trust fund. Ordinarily one of the implied duties of a trustee is to reduce to his possession the property which is to constitute the fund, and in this behalf to use the vigilance which a prudent grantee would deem to be necessary for his own protection in perfecting the title. Under this trust, however, the majority in interest of the certificate holders were in every respect to control the trust, and the trustee was not to execute any of the powers vested in him, except with the consent of such majority. These were the express terms of the declaration of trust. Consequently the duties of the trustee were little more than nominal. He was to administer a dry, naked trust. The syndicate had not been dissolved by the withdrawal of the members who refused to respond to the last call, nor were the powers of the executive committee annulled thereby. The association, being a partnership, with its assets divisible into transferable shares, was in substance, although not technically, a joint-stock company. Hedge's Appeal, 63 Pa. St. 273; Attorney General v. Mercantile Ins. Co., 121 Mass. 526. The executive committee remained the managing agent of the trust. Why it did not take any steps to compel the defaulting members of the syndicate to contribute their proportions, or to compel Hogg to contribute their proportions when he became a certificate holder of the $^{270}/_{1000}$ shares, it is unnecessary to consider. The committee did not do so, and, as it had not done so, the trustee was without funds. If Coe had possessed authority to act without the consent of the majority in interest of the beneficiaries, or the instructions of the executive committee, he would not have been in a position to compel Hogg to complete the transfer of the balance of the property which was to constitute the trust, and could not have redeemed that part of it which had been transferred subject to the pledge of Pyne. His inaction in these respects, therefore, was not a breach of duty.

Aside from these considerations, and putting the case as to Coe upon broader grounds, there is no justice in the claim made by the cross bill. As has been said, Coe was a trustee in little more than name. Every beneficiary was a trustee in a more real sense than the nominal trustee. The trust was a partnership in which each partner was entitled to participate in the active management of its affairs. Partners ordinarily keep themselves informed of what is being done in the partnership affairs, and it is to be presumed that the beneficiaries kept themselves informed of what was being done in the management of the trust. There is no evidence in the record that they did not acquiesce in what took place. If they did not

107 F.—52

personally participate in what was being done, the reasonable inference is that they were content to commit the management of the trust to the good judgment of the executive committee. If they have suffered loss through the delinquencies of the committee, the loss should fall on the members of the committee. Upon the case presented, Coe was no more responsible for it than was any other of the beneficiaries.

The claims asserted against Hogg stand upon firmer ground. The allegations of fraud set up in the cross bill find little support in the proofs, and, if Hogg had not taken the certificate for the 270 shares, it would be difficult to find any valid basis for a recovery against him. When he took that certificate, however, he succeeded to the position of the defaulting members of the syndicate, whose interests would have been represented by these shares. By doing this, and upon the principle of novation, he assumed towards the syndicate the position and the liabilities of the defaulting members,—a liability analogous to that of a stockholder to a corporation for the unpaid subscription price of his shares. Upton v. Tribilcock, 91 U. S. 45, 23 L. Ed. 203; Webster v. Upton, 91 U. S. 65, 23 L. Ed. 384. If he had recognized that liability and made the payments originally due from the defaulting members, the committee would have been possessed of funds sufficient to redeem the stocks pledged with Pyne, and to pay the purchase price of the shares of the development company's stock not already transferred. It is not improbable that there may have been an understanding between him and the executive committee that, instead of paying in money the $371,700 due from the defaulting members, he was to procure a release from Pyne of the pledged shares, and transfer to the syndicate the shares of the development company necessary to make up the whole 15,000. This, however, can only be surmised; and there is no evidence showing that such an understanding existed, or that there was any modification of the liability implied by his acceptance of the certificate.

After Hogg became a certificate holder of the 270 shares, as he was already a certificate holder for 500 shares, he was in a position to dominate the management of the trust. But the trust provision by which the majority in interest of certificate holders were to control its management is not to be construed as permitting an arbitrary and inequitable exercise of the power of the majority towards the minority. Such provisions are enforceable only when the majority exercises an honest discretion in the interests of all. See Hackettstown Nat. Bank v. D. G. Yuengling Brewing Co., 20 C. C. A. 327, 74 Fed. 110. He could not shelter himself behind this power to escape his own obligations to the syndicate, either as a vendor of the property to be transferred, or as a certificate holder of the 270 shares.

In view of Hogg's relation to the railroad company, the construction company, Pyne, and the syndicate, the executive committee might have been justified in allowing him to defer the immediate payment of the $371,700, or to defer vesting the syndicate with good title to the shares it was to acquire from him, and even to do so until the collapse of the enterprise. But, however this may be, when

the time came for the winding up of the trust the certificate holders became entitled to whatever belonged in equity to the fund. That time having arrived, the beneficiaries are entitled to an accounting.

The conclusion is reached that there should be a decree dismissing the cross bill, except as to the legal representatives of Hogg, and as to them there should be an accounting for the sum due from Hogg as a certificate holder of the 270 shares.

As pending the suit the real estate which constituted a part of the trust fund has been sold by a receiver pursuant to the order of this court, and the further administration of the fund does not require the appointment of a new trustee, the decree will provide for the appointment of a receiver, with the usual powers and duties of a permanent receiver, in lieu of a new trustee.

The complainants in the cross suit are entitled to costs.

A decree is ordered accordingly.