HARPER BROS. et al. v. KLAW et al.

(District Court, S. D. New York. January 6, 1916.)

1. COURTS ☞291—JURISDICTION—COPYRIGHTS—SUIT FOR INFRINGEMENT—CONTROVERSY WITH LICENSEE.

A suit by the owner of the copyright of a play to enjoin licensees from producing it as a photo-play, which right they claim under their license contract, is one for infringement of copyright, of which a federal court has jurisdiction, regardless of the citizenship of the parties.

[Ed. Note.—For other cases, see Courts, Cent. Dig. § 833; Dec. Dig. ☞291.]

2. COPYRIGHTS ☞82—INFRINGEMENT—PLEADING—COUNTERCLAIM.

Complainant, as owner of the copyright of a play, and defendants, as sole licensees for the production of the play, both claimed the right to produce the play as a photo-play, and complainant brought suit to enjoin such production by defendants as an infringement of the copyright. *Held*, that under new equity rule 30 (198 Fed. xxvi, 115 C. C. A. xxvi), which provides that a defendant "may' without cross-bill set out any counterclaim against the plaintiff which might be made the subject of an independent suit in equity against him," the defendants might in their answer by way of counterclaim set up their contract, and ask an injunction to restrain complainant from producing the photo-play as in violation of the contract.

[Ed. Note.—For other cases, see Copyrights, Cent. Dig. §§ 72, 73; Dec. Dig. ☞82.]

3. COPYRIGHTS ☞48—DRAMATIC COMPOSITION—RIGHTS OF LICENSOR AND LICENSEE—PRODUCTION OF PHOTO-PLAY.

In 1899 complainant, which was the publisher of the novel "Ben Hur," with the consent of the author, who owned the copyright, entered into a contract with defendants by which they were authorized to have written a dramatic version of the novel, to be approved by complainant and the author and copyrighted in the name of complainant, and were given the "exclusive right of producing such dramatic version on the stage," on certain conditions as to the size of the cities where produced, the payment of royalties, and the manner of computing the same; the contract further providing that there should be no change in the text or manner of performance. *Held*, that the contract did not give defendants moving picture rights in the play, and that its production by them in such form would be an infringement of the copyright. *Held*, further, that while such rights were not granted, there was an implied negative covenant by complainant not to use the ungranted portion of the copyright estate to the detriment of the licensees' estate, which covenant would be violated by the granting to another of the moving picture rights in the copyrighted play, and that defendants were entitled to an injunction to restrain the same.

[Ed. Note.—For other cases, see Copyrights, Cent. Dig. § 46; Dec. Dig. ☞48.]

In Equity. Suit by Harper Bros. and Henry L. Wallace against Marc Klaw and Abraham L. Erlanger, to restrain threatened infringement of copyright, with counterclaim for an injunction to restrain violation of contract. On final hearing. Injunction granted on both bill and counterclaim.

John Larkin, of New York City, for plaintiffs.
David Gerber, of New York City, for defendants.

HOUGH, District Judge. Plaintiff Wallace owns the copyright of the well-known novel "Ben·Hur," and Harper Bros. (a New York corporation) that of an authorized dramatization of the romance made in 1899 by one Young, who was employed for that purpose by the defendant partners, Klaw·& Erlanger (both New Yorkers), pursuant to a contract the true meaning of which is the ultimate problem presented by this case.

In 1899 Gen. Wallace's novel had long enjoyed popularity, and was known to be in many ways suitable for stage representation, with those spectacular accessories which the improved electrical and mechanical appliances of recent years have rendered possible. With the author's permission, therefore, Harper Bros. (the publishers of Ben Hur) agreed in writing with Klaw & Erlanger that (1) the latter should employ writers to produce "a dramatic version" of the novel; (2) such version should be approved by author and publishers of the novel, and copyrighted in the publishers' name; (3) after such approval the producers of the play should have no right to change the text or manner of performance in any material way; but (4) Klaw & Erlanger were granted the sole right (during the life of the copyright, if all conditions were duly complied with) of "producing on the stage," or "performing," the "dramatic version" provided for or created as above described.

In the preamble of the contract it is recited as the purpose thereof that the defendants are to obtain "the exclusive right of producing *such dramatic version* on the stage"; i. e., the dramatic version made by Young and paid for by Klaw & Erlanger. In pursuance of this written agreement the play was prepared, approved, and copyrighted. It follows the novel very closely, and it would (I think) be quite impossible to make another play that really told the story of Ben Hur without presenting substantially the same sequence of ideas as is presented by the copyrighted version of Young. That version in turn uses, far more frequently than is often the case, the exact words of the novel of which it is the derivative. When this contract was made the moving picture art was (in the trite phrase) in its infancy. There were moving pictures, but it was then completely beyond the known possibilities of the art to produce a series of pictures representing such and so spectacular and elaborate a play or performance as is the Ben Hur of Klaw & Erlanger.

For about 14 years Ben Hur has been produced in obedience to the contract of 1899, and apparently to the great pecuniary satisfaction both of the copyright owners and their licensees, Klaw & Erlanger. Lately, however, it is shown to have occurred to both parties to the contract that the public might be growing tired of the play as shown with actors speaking on the stage, and that (considering the enormous advances in recent years in the moving picture art) a photo-play of Ben Hur might reach, if not a new audience, at all events one that probably would not much longer pay ordinary theater prices to see so old a production. Thereupon both Harper Bros., as owners of the copyright, and Klaw & Erlanger, as licensees thereunder, assert that they and they alone possess the photo-play rights. The defendants have gone so far in the assertion of their position as to write a letter in which it is definitely said that they will produce Ben Hur as a photo-

play when and as they choose. This bill is brought to restrain the defendants from carrying out that threat, on the ground that such a production would be an infringement of copyright.

[1] Defendants have answered, questioning the jurisdiction of the court, but also denying that such production of Ben Hur as a photo-play would be an infringement, and alleging the contract of 1899 as full justification of their position. They then pleaded further, and under equity rule 30 (198 Fed. xxvi, 115 C. C. A. xxvi) set forth the same matter as a counterclaim, and in their turn ask the court to enjoin the plaintiffs from violating their contract of 1899 by doing, or seeking to do, exactly what Klaw & Erlanger claim for themselves; i. e., produce Ben Hur as a photo-play. I am quite unable to doubt jurisdiction as to the original bill of complaint. It shows a copyright case of a simple kind. The sole question is whether Mr. Klaw's letter hereinabove referred to is or is not a threat of violating copyright; and it is such a threat unless it becomes, by reason of the contract of 1899, the mere assertion of a lawful right.

Plaintiffs do not rest upon the contract, nor bring their action to enforce the contract; they seek to restrain the commission of a tort, and leave the defendants to come in and prove, if they can, that the action complained of is not a tort, because it is justified by a contract. To be sure, plaintiffs do in their bill anticipate this defense; but that is a matter of no moment. There is really no difference in the technical structure of the bill herein and that of the cases cited by plaintiffs. Healy v. Sea Gull Specialty Co., 237 U. S. 479, 35 Sup. Ct. 658, 59 L. Ed. 1056; Henry v. Dick Co., 224 U. S. 1, 32 Sup. Ct. 364, 56 L. Ed. 645, Ann. Cas. 1913D, 880.

[2] Whether there is jurisdiction of the defendants' counterclaim is a far more curious question, and one upon which there is great paucity of authority. Prior to the present rules in equity defendants would have been obliged to file a cross-bill, if they had sought to obtain the relief here demanded. Whether such a cross-bill as this could be sustained under Lautz v. Gordon (C. C.) 28 Fed. 264, and Hogg v. Hoag (C. C.) 107 Fed. 807, and 154 Fed. 1003, 83 C. C. A. 677, is a point on which much learning (probably useless) might be expended. It is my opinion that rule 30 in equity has deliberately and wisely enlarged the function of a cross-bill, now called a counterclaim. The language of that rule is that:

The answer "may without cross-bill set out any counterclaim against the plaintiff *which might be made the subject of an independent suit in equity against him*, and such counterclaim so set up shall have the same effect as a cross-suit, so as to enable the court to pronounce a final judgment in the same suit both on the original and cross-claims."

It is in my opinion now proper to do what these defendants have done; i. e., deny the equity of plaintiffs' bill, ground such denial on the language of a written document, and serve a counterclaim to prevent plaintiffs from violating said contract as understood by defendants. It is proper to do this, even though it cannot be said that the matter of the counterclaim, cross-suit, or cross-bill is merely auxiliary to the original suit. It is enough that in the language of the present rule the

counterclaim shows something "which might be the subject of an independent suit in equity against" the plaintiffs.

It follows that the next query is whether such an action as is here shown by defendants' counterclaim is a suit properly cognizable in equity. I think it is, on two grounds:

First. It is within the reasoning of some modern cases, of which Miller v. Uhlman (D. C.) 198 Fed. 233, is a good example. These cases display an inclination to greatly and justly expand the function of a cross-bill, even before the present equity rules.

Second. Remembering that this is an action for infringement of copyright, the real theory of the counterclaim or cross-suit is that plaintiffs threaten to infringe the rights of defendants, and in a very true sense should be considered as infringers themselves. This is exactly what may be and has been done in respect of patents. A patentee may be an infringer of his own patent, if after assignment thereof he does something that amounts to a violation of his contract with assignee. An ordinary action in equity for the infringement of patent rights may then be brought against the patentee himself. Piaget Novelty Co. v. Headley (C. C.) 107 Fed. 134; Id., 108 Fed. 870, 48 C. C. A. 116. The same remedy seems to me open to a similarly injured licensee.

[3] Being, therefore, of opinion that both the original action and the counterclaim are well brought, the merits of the case may be considered. It must be admitted (especially in this litigation) that the "exhibition of a series of photographs of persons and things arranged on films as moving pictures, and so depicting the principal scenes of an author's work as to tell the story, is a dramatization of such work," because all the parties to this litigation united in procuring such determination from the Supreme Court in Kalem Co. v. Harper Bros., 222 U. S. 55, 32 Sup. Ct. 20, 56 L. Ed. 92, Ann. Cas. 1913A, 1285. If by the agreement of 1899 the defendants had been granted the exclusive right of dramatizing Ben Hur, or producing any play or plays that might be made out of Ben Hur, there would be no doubt at all as to their right to make a "movie play," as well as the kind of play that has heretofore been produced.[1]

But the grant made by that agreement was far more limited. The right conferred was to produce one version only, and that in a particular manner, and in places limited to cities of a certain size. The contract prohibits any change in the manner of performance or text, and contains provisions as to royalties and their computation, confessedly incapable of application to any method of producing photoplays in commercial use or known to witnesses or counsel. It is unnecessary to expand this thought. The whole arrangement made between the parties in 1899 is not only inconsistent with, but repugnant to, the thought of making "movies" out of Ben Hur.

[1] Note.—The Kalem Case was (as this is) an action for infringement of copyright. Klaw & Erlanger were joined as defendants, because they were the exclusive licensees of the copyright owners. It might well be said that there was a contradiction in terms in making them plaintiffs in that case, if they had no rights to be infringed upon by the production of moving pictures or photo-plays of Ben Hur. This point, however, has not been here argued, and certainly was not raised in the Kalem Company Case.

This differentiates the case at bar from Frohman v. Fitch, 164 App. Div. 231, 149 N. Y. Supp. 633, with which I fully concur; but these defendants never got so ample a grant as did Mr. Frohman. It follows, since the copyright covers a photo-play, and Klaw & Erlanger got no license to make or produce one, they would infringe if their threat were carried out; therefore they must be enjoined.

Plaintiffs assert, and almost assume, that since defendants cannot make a "movie" out of Ben Hur, and such right must exist somewhere, it is in them, as being an unconveyed portion of the copyright estate wherefrom was carved defendants' limited license. In strictness of law I think this true; but it does not always follow that, because one owns a certain thing, he may use it to the detriment of another, especially if the owner is under contractual obligations to such other. The "movie" rights to Ben Hur undoubtedly existed in 1899, but in nubibus, or (what is frequently the same thing) in contemplation of law only. As matter of fact they are an accretion or unearned increment conferred of late years upon the copyright owners by the ingenuity of many inventors and mechanicians.

In my opinion there is implied a negative covenant on the part of the plaintiffs (the grantors of defendants' restricted license) not to use the ungranted portion of the copyright estate to the detriment, if not destruction, of the licensees' estate. Admittedly, if Harper Bros. (or Klaw & Erlanger, for the matter of that) permitted photo-plays of Ben Hur to infest the country, the market for the spoken play would be greatly impaired, if not destroyed. This being the fact, the law is analogous to that which implies, from a covenant to make a certain use of property, a covenant negative against doing anything else with it. High on Injunctions (4th Ed.) § 1151A, and cases cited.

The result is that plaintiffs may take the injunction prayed for against defendants, and the defendants may have the same relief against plaintiffs. The meaning of such double injunction is that, as long as the contract of 1899 exists, neither party thereto can produce a photo-play of Ben Hur except by bargain with the other.

There will be no costs.