## MILLER v. UHLMAN et al.

### (District Court, D. Oregon. June 3, 1912.)

### No. 3,571.

1. REFORMATION OF INSTRUMENTS (§ 45*)—SUIT IN EQUITY—SUFFICIENCY OF EVIDENCE.

Evidence considered, and *held* insufficient to sustain the burden of proof resting on a complainant to establish mistake or fraud which would entitle him to a reformation of contracts by the terms of which he bound himself jointly with a tenant to sell and deliver to defendants a stated quantity of hops each year for five years, to be raised on the leased land of which complainant was owner.

[Ed. Note.—For other cases, see Reformation of Instruments, Cent. Dig. §§ 157–193; Dec. Dig. § 45.*

Reformation of instruments as dependent on mutuality of mistake, see note to American Ass'n v. Williams, 93 C. C. A. 10.]

2. EQUITY (§ 199*)—CROSS-BILL—JURISDICTION OF SUBJECT-MATTER.

In a suit by the owner of land which he had leased for a term of 10 years to reform certain contracts by which he had bound himself jointly with his tenant to sell and deliver a stated quantity of hops each year for five years, where it appeared that advances by the purchasers were made to complainant to be disbursed by him to aid the tenant in raising and harvesting the hops, a portion of which he retained and applied on rentals and other indebtedness due from the tenant to him, a cross-bill by the tenant for an accounting in respect to such advances is germane to the bill, and the court may retain jurisdiction to determine the damages sustained by the tenant by reason of an alleged wrongful ouster from the leased premises.

[Ed. Note.—For other cases, see Equity, Cent. Dig. §§ 463, 464; Dec. Dig. § 199.*]

3. LANDLORD AND TENANT (§ 132*)—WRONGFUL DISPOSSESSION OF TENANT.

A Chinese tenant of a farm under a lease for 10 years which contained no provision for forfeiture for nonpayment of rent, nor for termination by notice, but who was forced by a series of annoyances and intimidations to leave the premises pursuant to a notice to quit, *held* to have been wrongfully ousted, and to be entitled to recover the damages thereby sustained.

[Ed. Note.—For other cases, see Landlord and Tenant, Cent. Dig. §§ 460–464, 467–469; Dec. Dig. § 132.*]

In Equity. Suit by Nicholas Miller against William Uhlman, William J. Wanmaker, Ferdinand Goebel, and J. M. Kaufman, partners under the firm name of S. & F. Uhlman, and Chin Toy. On final hearing, on bill and cross-bill by Chin Toy. Decree for cross-complainant.

This is a suit instituted by Nicholas Miller against William Uhlman, William J. Wanmaker, Ferdinand Goebel, and J. M. Kaufman, copartners in business under the firm name of S. & F. Uhlman, and Chin Toy, a Chinaman, praying for a decree reforming four certain hop contracts, the same having been entered into on February 24, 1908, between the complainant and Chin Toy, designated in the contracts as "seller," and S. & F. Uhlman, designated as "buyer," whereby the former agreed to produce on certain premises and to sell, and the latter agreed to buy, 30,000 pounds of hops for each of the years specified in the respective contracts, namely, 1909, 1910, 1911, and 1912, at the stipulated price of 11 cents per pound. Among other things, it is stip-

ulated that the buyer shall advance to the seller, as part payment under the contract for each year, $200 on or about February 24th, $250 on or about May 1st, and $1,350 on or about September 1st, or so much·thereof as is actually required for cultivating, picking, drying, and baling purposes, the balance of the payments to be made upon the delivery of the hops. Previous to the execution of these contracts, namely, on March 8, 1905, Miller, by an indenture of lease duly executed, leased to Toy, the Chinaman, the lands and premises upon which the hops were to be grown for the term of 10 years beginning April 1, 1905, at a rental of $210 for the first year, and $259, payable half-yearly, for each and every year thereafter. By a stipulation in the lease, it is provided that Toy will erect on said premises two substantial houses for drying hops, and a house for·storing the same. The buildings, by another stipulation, are to be delivered up by Toy to Miller at the termination·of the lease. One Charles B. Young guaranteed the faithful performance of the terms of the lease on the part of Toy. Complainant alleges, in effect, that during the negotiations between M. H. Gilbertson, who was the recognized agent for S. & F. Uhlman, and Toy for the production and sale of the hops, Gilbertson requested that the complainant, Miller, should become disbursing agent under the contracts, and should receive and handle all the moneys for the Chinaman, to ward against any misapplication of the funds by him, and that thereupon it was agreed between the parties, including Toy, that Miller should be the disbursing agent of the defendants S. & F. Uhlman, and should receive and handle the money for Toy, and see to the proper application of the same towards the cultivation and harvesting of said hops, for which service Miller was to receive as his remuneration one cent per pound which was included in the contract price for the hops; that Gilbertson fraudulently represented to Miller, for the purpose of inducing him to sign said hop contracts, that such signing by him jointly with Toy would be necessary to entitle him to receive, as such disbursing agent, his one cent per pound for the hops produced and sold, and positively assured Miller that his character in regard to said contracts was that of agent, and not as a contractor respecting the hops; that, as further inducement for Miller to sign such hop contracts, Gilbertson represented that it was necessary for him so to do in order to release his rights against the hop crops for the rental stipulated to be paid by Toy to Miller under the lease for the premises upon which the hops were to be grown, and thereby render the said hops free from incumbrance to the buyer; that at the time of the execution of the hop contracts Toy gave Miller a writing whereby, in consideration of services rendered and to be rendered in connection with the hop contracts, he agreed to pay to Miller one cent per pound for each pound of hops delivered under such contracts. It is further alleged that said contracts were never read over to or by Miller, and that Gilbertson and Benedict, another agent for S. & F. Uhlman, positively assured Miller that by signing said contracts he was signing to constitute himself disbursing agent only, and would not thereby render himself in any manner responsible as principal for the production and sale of the hops along with Toy, and that Miller, relying upon said representations, and without reading the contracts, was deceived and overreached by them, and induced to execute the said contracts in tenor as set out in the bill.

Prior to the commencement of this suit, S. & F. Uhlman instituted an action against Miller for the recovery of damages for his refusal to make delivery of the hops grown on the premises designated in the year 1909 in accordance with the terms of the hop contract pertaining to that year. The prayer is for a decree permanently enjoining further prosecution of this action, as well as a reformation of the said hop contracts. The defendants S. & F. Uhlman controvert the allegations of the bill, and by a cross-bill set up the execution of said hop contracts by Miller, the advancement to him of the moneys as stipulated for the production of the 1909 hop crop, and $100 additional, and the further performance of the terms of said contract on. their part in all respects. They also allege a breach of the contract.on the part of Miller in his refusal to deliver the hops as stipulated to be delivered for that year, namely, 30,000 pounds, for which damages in the sum of $6,100

are claimed and demanded. General damages in the sum of $4,500 are likewise demanded for a breach and refusal on the part of Miller to perform the contracts for the delivery of hops in the years 1910, 1911, and 1912. Chin Toy has also interposed a cross-bill, complaining of Miller, in that he has violated his contract of leasing with Toy and wrongfully ousted him from the premises, and he seeks an accounting with Miller for moneys received by the latter under the terms and stipulations of the hop contracts and from other sources, and not paid to Toy, and for damages for a breach of the said contract of leasing, whereby Toy was ousted. On the issues thus presented, the cause was submitted to the court under the evidence for determination upon the merits.

Carson & Brown, of Salem, Or., for complainant.

Teal, Minor & Winfree, of Portland, Or., for S. & F. Uhlman.

John H. Woodward, Jerry E. Bronaugh, and Loyal H. McCarthy, all of Portland, Or., for Chin Toy.

WOLVERTON, District Judge (after stating the facts as above). [1] From the testimony it would seem that Chin Toy first broached the subject of a contract respecting the production and sale of the hops from the premises held under lease by him from Miller to George H. Benedict, agent of S. & F. Uhlman, along with Gilbertson, who informed him (Toy) that he should have the owner of the premises sign with him. Toy, having indicated that Miller would sign with him, was told to bring Miller over to Aurora to see Gilbertson, and make the necessary arrangements. Miller relates that Gilbertson wrote him to come over to Aurora, and that he went in response thereto. On his arrival, a conversation occurred between him and Gilbertson, as follows:

"He said, if I would act as agent between him and the Chinaman, he would give the Chinaman 10 cents a pound for his hops, although he said he had made contracts for 9½ of my neighbor Mr. Sears, and I told him that I did not care to do it, and he said he would not give the money any other way to the Chinaman, that he would make a contract with him to raise the hops for 10 cents a pound, and that he would give me 1 cent, and that I could make what he owed me in a few years out of it in that way. Well, we talked it over, and I agreed to act as agent in that way, and in a day or two he told me to come down to Portland, and that they would try and arrange it, and I did, and they made an arrangement with the Chinaman."

On being asked what was said and done in Benedict's office in Portland, before signing the contracts, Miller says:

"I asked Mr. Gilbertson what he wanted me to do, and he said he wanted me to release the lien that I had on the crop to make it possible for them to get the crop from the Chinaman, and by my signing the contract that the money would go through my hands as their agent, that any money that was over and above what was furnished the Chinaman would be to my credit, and that I could get some of my indebtedness in that way. If I did not sign the lease, that they could not give the Chinaman a contract for 10 cents a pound, and, if I would sign it, that I would protect them from the Chinaman. * * * The Chinaman was to get 10 cents a pound, and Mr. Gilbertson said they would give 11 cents, and that I would get 1 cent for acting as agent between them. * * * Eleven cents was given in order that there would be an opportunity to give me 1 cent for my services as agent."

Being asked who was to pay the one cent, he further testifies that:

"Chin Toy or the hops, the quantity of hops. I was to get 1 cent. They fixed it so that I should get 1 cent, and they got the Chinaman to pay that

when the hops would be received. I was to get 1 cent, and the Chinaman 10 cents."

Miller testifies that his duties were to be "to receive the money and disburse it for producing the hop crop and to protect them, and to see that the Chinaman used the money for raising the hops." He further relates that in signing the contracts he never inspected them; that Benedict read the matter pertaining to the price they were to pay and the time they would receive the hops, and then called for Miller's signature; that he (Miller) raised a question as to his responsibility for the production of the quantity stipulated, and that Benedict replied that:

"It was only a form that they had printed, that the company had printed, and that it was more red tape than anything else, and that I would not be responsible for that at all. I asked him why he described my farm, and he said it was necessary to do that because the hop yard had not been platted and that they could not separate the hop yard, and that they had to take the whole farm in order to have the hop yard correctly mapped out, or something to that effect."

Witness further says:

"I was signing the lien that I had away, as I was told that they could not make a contract if I did not sign away the mortgage that I had on the crop, and by signing it I would allow the Chinaman an opportunity of giving them the hops. * * * I did not read them [the contracts] at all, and I had no glasses at the time. Even if I had, I could not have read the print— what was printed in it. He called it red tape. He only read the part in regard to when he would give the money to produce the crop, so much in February and so much in May, I think it was, and so much in the fall to pick them. It was understood right along that I was not held responsible for the Chinaman at all, that I was only to be between them and the Chinaman to protect them. Mr. Benedict himself laughed at the idea that I was to be responsible, living in Woodburn. He said: 'How could we hold you responsible? You are not living there at all.' * * * Gilbertson said the same thing. Mr. Gilbertson seemed to be the principal man that was contracting. Mr. Benedict was the man, they said, who wrote those contracts. I thought there would be one contract, and when they signed them there was five of them, and I signed them after he said finally that it was the purpose to place me in position that I would not take any advantage of the Chinaman when he had the crop ready to receive, because I held a mortgage, and they said, of course, it would always be possible, if the Chinaman did not treat me right, that I might crowd him. And that was understood at Aurora, with Mr. Gilbertson and myself, that they were working as they claimed for my interest as he was owing me, and that I could get some of my money out of the Chinaman year by year."

Along with this is a supposed admission of Gilbertson to the effect that it was thoroughly understood that all the money to be advanced by S. & F. Uhlman was to pass through the hands of Miller.

Such is the evidence, together with proper inferences to be drawn from the way in which the negotiations were consummated and the manner of observing the supposed stipulations of the parties, upon which the complainant relies for relief in reforming the hop contracts.

As against this testimony, both Benedict and Gilbertson testify positively and unreservedly that such was not the understanding and purpose of the parties in executing the contract; that the understanding was none other than such as is expressed in detail in the writings

themselves. Although Miller saw Gilbertson at Aurora, and had some discussion about the matter, the final consummation of the contracts took place in Portland, at the office of Benedict and Gilbertson, in the presence of Miller, Benedict, Gilbertson, Toy, and another Chinaman. Benedict says that, after the papers were prepared, Miller made some sort of objection to signing, but that he was told, if he did not sign then, that the deal would not be made. Thereupon a discussion was held between Miller and Toy with reference to what Toy would pay Miller, and, it being agreed between them that Toy should pay one cent per pound upon all hops delivered under the contracts, Miller signed the contracts without further question. Benedict further says that they gave Miller the contract to read, and there was some discussion about his responsibility, which he refused to assume unless the Chinaman would pay him the one cent per pound commission. Witness flatly denies that there was any arrangement entertained or entered into to the effect that Miller was to act as the agent for S. & F. Uhlman in disbursing the moneys to be paid to Toy for producing the hops, or that Miller was so to act as the agent of the buyers, or as their agent in any respect. He relates, further, that it was understood from the beginning that they were to pay Toy 11 cents per pound, and not 10 cents, as claimed by Miller, and that the 1 cent per pound was to be paid by the Chinaman out of his receipts, and not by the buyers, as compensation to Miller over and above what Toy was getting. Gilbertson corroborates Benedict in every respect. Aside from this, Miller, in effect, admitted to Mr. Woodward, attorney for Toy, that he and Toy had entered into a contract with S. & F. Uhlman for the delivery of 30,000 pounds of hops for five years consecutively.

The question presented at this point is purely one of fact, namely, whether complainant has made out a case for the reformation of these contracts. The burden of proof is with him, and, further, he is required to substantiate his contention by clear and convincing testimony, so that it may appear to a moral certainty that he is right in his position. At the outset the contracts stand against the complainant. Presumptively they were fairly executed, and truly represent the ultimate agreement of the parties. This Miller must impeach before he can establish his contention. He would avoid them on the ground of mistake on his part, coupled with fraud on the part of Benedict and Gilbertson in misleading him into the belief that he was signing contracts of entirely different import, his understanding being that he was entering into contracts to become a disbursing agent only for S. & F. Uhlman, from whom he was to receive his pay, and not a joint contractor with the Chinaman, receiving from the latter a consideration for the liability he was assuming. The two theories are very wide apart, and it seems hardly possible that there could have been any mistake about the effect of the transaction. Beyond the fact that Miller is contradicted by two witnesses is the fact attending the transaction of Toy giving to Miller directly a stipulation to pay him 1 cent per pound for each pound of hops delivered, in consideration

of services rendered and to be rendered in connection with the hop contracts, from which the clear inference is that Toy was to receive the 11 cents per pound, and that out of it he, not S. & F. Uhlman, was to pay Miller. The relations of Toy to Miller in previous business transactions have a bearing upon the question. Toy was a renter from Miller, and was obligated to pay him the stipulated rentals. Toy was also supposed to be indebted to Miller, and the latter held a chattel mortgage as security, so it was to his interest that Toy should be able to dispose of his hops, and at the same time that Miller should be put into a position to handle the proceeds. He would thus be the better enabled to obtain both his rentals and the debt due him from Toy. Miller's management of the moneys paid to him indicated a purpose of securing himself rather than of acting merely as disbursing agent for the buyers, for he withheld advances from Toy when they were needed for cultivation and for meeting other expenses in producing the crops.

The evidence, taken all together, with the circumstances and conditions attending the transaction and the manner in which Miller treated the contractual relations, indicates to my mind quite clearly that the contracts themselves voice the real understanding between the parties. At any rate, it is beyond cavil that Miller has failed to make out his contention by a preponderance of evidence so as to entitle him to a reformation of the contracts. The preponderance is clearly the other way, and hence he cannot recover upon his theory of the case. I have cited no authorities, because the facts determine the controversy.

S. & F. Uhlman interposed a cross-bill along with their answer, setting up a breach on the part of Miller of the contract for the year 1909, in failure to deliver the 30,000 pounds of hops stipulated for in the contract, and praying damages therefor. Although a breach is suggested, and a tender alleged of the balance due on the contract price of the hops, the controversy pertaining thereto, if it was ever intended to be insisted upon, seems to have been lost sight of. At least, it is not now seriously pressed by either party. The bill of complaint should therefore be dismissed, and the defendants S. & F. Uhlman remitted to their action at law touching any damages they may have suffered by reason of the alleged breach.

[2] This brings us to the cross-bill of Chin Toy. It is urged that this bill should be dismissed, because, first, it is not germane to the main suit, and, second, it is not based upon equitable grounds. The cardinal purpose of the main suit is to reform the hop contracts. Whether the hop contracts are to be reformed or not, there is involved a fiduciary relationship between Miller and Toy, because the money advanced for the growing of the hops was to pass through Miller's hands, and the final payment for the crop was to be made to him, so that he, in a sense, became the financial agent for Toy in relation to these hop contracts. Miller as complainant has also set up the lease between himself and Toy, and claims that Toy abandoned it. This Toy denies, and alleges that he was wrongfully ousted from the premises covered by the lease. Thus is injected into the record the controversy about the lease. Toy's cross-bill sets forth the mat-

ters proper for an accounting between him and Miller, which appeals to the jurisdiction of equity, and the matter alleged touching the lease is responsive to the bill of complaint, so that the cause asserted by the cross-bill would seem to be both germane to the principal case and equitable in its nature. True, the question of damages arising from a wrongful ouster of Toy from his lease is properly the subject for an action at law, but the court of equity having jurisdiction for the accounting will retain jurisdiction to determine the amount of damages resulting from the ouster, especially as the accounting involves the rentals growing out of the leasing.

Complainant Miller, answering Toy's demand for an accounting, sets out by an exhibit designated "A" an account for rent claimed to be due upon the lease. He claims credit for the rent beginning with the execution of the lease and extending to April 1, 1909, aggregating with interest charges $1,301.56. Against this he gives Toy credit for payment by cash, $209.50, leaving a balance due Miller of $1,092.06. Exhibit B is a statement of the general account between Miller and Toy. The statement is really divided into four distinct statements or sections. The first runs from March 31, 1906, to and inclusive of November 24th, last item appearing. By this account Miller charges Toy in the aggregate of the items set out with $2,689.42, and credits him with $2,125, leaving a balance due Miller of $564.42. The second statement comprises two items of charge against Toy, namely, September 1, 1907, $500, and December 31st checks $295, aggregating $795. Against this there is no credit. The third statement begins with April 6, 1908, and ends with December, within which time Toy is charged with $2,031.23, and is given credit for $2,677.50, showing a balance in his favor in the sum of $646.27. The fourth simply consists of a charge for $100, money advanced March 27, 1909. Against this there is no credit. Miller's balance of claim in the accounting against Toy, after deducting the credit of $646.27, is $1,905.21.

A great deal of testimony has been taken respecting these accounts; the many items thereof having been gone into with infinite detail. In the course of Miller's examination as a witness in his own behalf, a receipt signed by him for the sum of $396.50, bearing date March 13, 1907, was introduced, which purports to be "in full of all claims and rent due April 1st/07, except potato a/c." Miller afterwards explains that this receipt did not include the notes. But in this he is evidently mistaken. The notes given by Toy to Miller prior to the date of this receipt were one for $700, of date April 17, 1906, and one for $220, of date November 17, 1906. On December 7, 1908, Miller rendered a statement to Toy of the latter's indebtedness to him, aggregating $1,449.23, in which the item of the $700 note does not appear. Toy testifies that he paid the $220 note, in which testimony I think him worthy of credit. This receipt, therefore, affords a landmark along the way, and one that must be relied upon. It disposes of the rent account falling due April 1, 1907, and all items prior thereto, and the entire first section of statement "B" of Miller's account. The parties must start even again from the date

of April 1, 1907, except that Toy owed Miller for 45 sacks of potatoes, which the evidence shows were worth $1 per sack. The section of the account (Exhibit B), pertaining to 1907, consists of the two items only as above indicated. The note, however, was given for future advances, and the $295 represents such advances. Both the note and these advances are charged to Toy, which, of course, is faulty bookkeeping. Miller, however, did some work for Toy, which he says amounted to $265.95, and besides he furnished Toy with some kiln cloth and paid insurance on the hops, which, together with the labor account and checks, amounted to $581. This therefore is the correct amount with which Toy should be charged in account for the year 1907. This year was an unprofitable one for Toy, as the hop crop molded on the vines, and but few hops were gathered. The section of the account (Exhibit B) comprising the year 1908, counsel for Toy admit is not open to criticism. For this year Toy is entitled to a credit balance of $646.27. For the year 1909 the charge of $100 against Toy is unjust, as the funds were expended in cultivation of the crop that year, of which Miller got the benefit.

Now, to return to the rent account. Toy paid the rent falling due September 1, 1907. This is evidenced by a deposit tag showing the amount deposited to the credit of Miller in the Bank of Woodburn. This would leave due Miller all the rent for 1908 and the half yearly rent due April 1, 1909, amounting to $388.50. On or about February 26, 1909, Miller served upon Chin Toy a notice to quit and vacate the premises held under the lease, which notice purports to have been given and served for the reason that Toy failed to pay the rent due and unpaid on September 1, 1908, specified as $259. Toy left the premises on April 5, 1909; the half yearly rent having accrued. Toy is therefore properly chargeable with that item. So that, summing up, Chin Toy, in account with Miller, should be charged:

| | |
|---|---:|
| With balance for 1907 | $581.00 |
| With rent unpaid | 388.50 |
| **Total** | **$969.50** |

On the other side he is entitled to credit:

| | |
|---|---:|
| By balance for the year 1908 | 646.27 |
| Leaving due Miller on the final accounting | $322.23 |

To which should be added the value of the

| | |
|---|---:|
| 45 sacks of potatoes, at $1.00 per sack | 45.00 |
| Making a total of | $367.23 |

[3] Further than this Chin Toy claims damages by reason of having been ousted from the premises held under the lease and forced to abandon the lease. Respecting this issue, the first matter to be determined is whether Toy was wrongfully ousted. About the issue there need be but little said. That notice to quit bearing date February 26, 1909, was served upon Toy, is admitted, and that Toy aban-

doned the premises in response thereto is a fact hardly to be disputed. Toy relates that Miller's son asked him to give him half of the farm, meaning the hop fields, and Toy refused, and he assigns that as a reason for a good deal of his trouble with Miller. Tom, Miller's son, at one time, Toy says, "tried to shoot the fence up," which scared Toy. It is evident that Toy suffered great annoyance at the hands of Miller in the way of withholding the advances made on the hop contracts, when Toy needed them for paying expenses of cultivation. The last instance which is definite and specific is, when S. & F. Uhlman made the first advance payment of $200 for the year 1909, Miller withheld this from Toy when he needed it badly, and in the end Toy was able to obtain only $100, after an action had been threatened. Following these differences, Miller served upon Toy the notice to quit for nonpayment of the rent for 1908, and Toy was forced, as he thought, to surrender the premises and give up his lease. Miller seeks to ameliorate the effect of the notice by saying he did not mean to force Toy off the place. His language is:

"I gave him notice. I thought it might keep him quiet so he would not bother me so much, and afterward I gave him the money, and treated him as I always had. I waived that notice. I do not know whether he understood it or not, but I waived it. I did not want him to bother me, and I thought it might keep him quiet."

By reference to the lease, it will be seen that there is no stipulation for forfeiture for nonpayment of rent, and the lease gave no authority for serving the notice to quit. The notice, however, had its effect, and Toy quit the premises, not to return. I am convinced that it was the deliberate purpose of Miller to force Toy to leave the premises and abandon his lease, and that Toy was forced to leave by a series of annoyances and intimidations. The Chinaman, being naturally timid, was so wrought upon that he was afraid to continue in the possession to which he was rightfully entitled.

Damages are claimed for the value of the unexpired term of the lease. From the proofs it cannot be seriously urged that the unexpired term has any value. A number of witnesses have testified that it costs from 10 to 11 cents per pound to produce hops and put them in the bale ready for market, and some say this is so exclusive of the rent charges. I am surprised at the testimony, as it seems strange that growers are willing to enter into contracts for the production of hops at from 9 to 11 cents per pound when they cannot be grown at a profit at those figures; but, notwithstanding, the absolute weight of the testimony is that way. Considering this testimony, along with the uncertainty of the crops, I cannot say that the unexpired term is of any certain value whatever. However, it has been shown very clearly that Toy expended $1,820 for hophouses and buildings, which are annexed to the soil and have become permanent improvements. These revert under the lease to the owner of the land, and become his property. Toy has had the use of these houses for four years of his term, but is being deprived of their use for six years. It is equitable that he should recover from Miller the relative expenditure according to the length of the remainder of

the term, which is six-tenths of the whole, or $1,092. Deducting therefrom the amount due Miller on the accounting, namely, $367.-23, leaves Toy entitled to recovery against Miller in the sum of $724.-77, and such will be the decree of the court. Miller must be taxed with the costs of the suit.