HACKETTSTOWN NAT. BANK v. D. G. YUENGLING BREWING CO.

(Circuit Court of Appeals, Second Circuit. May 12, 1896.)

1. CORPORATIONS — RIGHTS OF MAJORITY AND MINORITY BONDHOLDERS — COL-
LUSIVE ACTION OF MAJORITY.
    Provisions in corporate bonds, or in the trust deed securing them, that
a specified majority in value of the bondholders may, by their action.
bind the minority to any alteration, modification, or compromise of their
rights against the corporation or its property; including a postponement
of the time of payment of interest or principal, are enforceable only
when the majority exercise an honest discretion in the interest of all;
and an agreement by a corrupt or collusive majority, waiving condi-
tions and postponing the payment of interest for the purpose of compelling
the minority to sell out to them on terms of their own dictation, would
not bind the minority.
2. SAME—ACTION AT LAW BY MINORITY BONDHOLDER—EXECUTION LIEN.
    A holder of bonds secured by a trust deed on all the property of a cor-
poration, who seeks to enforce payment by an action at law, will not be
permitted to enforce a lien by execution, to the embarrassment of the
other bondholders.

In Error to the Circuit Court of the United States for the South-
ern District of New York.

This was an action at law by the Hackettstown National Bank of
Hackettstown, N. J., against the D. G. Yuengling Brewing Company,
upon certain bonds issued by that corporation. The circuit court
directed a verdict for defendant, and to review the judgment en-
tered thereon plaintiff sued out this writ of error.

Dan'l Seymour (Dill, Seymour & Kellogg and Frederick R. Kel-
logg, of counsel, on the brief), for plaintiff in error.

Louis Marshall (Samuel Untermyer and Louis Marshall, on the
brief), for defendant in error.

Before WALLACE and SHIPMAN, Circuit Judges, and TOWN-
SEND, District Judge.

WALLACE, Circuit Judge. Error is assigned of the ruling of the
trial judge in directing the jury to find a verdict for the defendant.

The action was brought to recover the principal and interest of
certain second mortgage bonds owned by the plaintiff, part of an
issue of $1,000,000, created by the defendant, and secured by a trust
deed upon all its real and personal property. The bonds bear date
December 31, 1893, and are payable, the principal July 1, 1908, and
the interest semiannually on the 1st days of January and July in
each year, subject to conditions indorsed upon the bonds, of which
the following are material:

"(4) The principal moneys hereby secured shall become due and payable
forthwith * * * if the company makes default for a period of three cal-
endar months in the payment of any interest hereby secured thereby, and the
bearer or registered holder hereof, as the case may be, before the interest so
in arrear is paid, by notice in writing to the company, calls in the principal
moneys hereby secured."

"(11) Subject to the conditions of the trust deed hereinafter mentioned, the
holders of three-fourths in value of the outstanding bonds of this series may
sanction any agreement of the company for any modification or alteration

of the rights of the bondholders of this series as a class, including the release of any property charged thereby, and any postponement of the time for the payment of any moneys secured thereby, and any increase or reduction of the rate of interest; and an agreement so sanctioned shall be binding upon all bondholders of this series, and notice of any action thus taken shall be given to each bondholder, and each bondholder shall be bound thereupon to produce his bond to the company, and to permit a note of such modification to be placed thereon."

The mortgage provides that the security shall be enforceable if, after default shall have been made in the payment of the principal of the bonds, and continued for six months or in payment of interest, and continued for three months, the holders of a majority of the bonds shall, by notice to the trustee, elect and declare the principal and interest payable. It also contains provisions for meetings of the bondholders, to be called at the request of the company, the trustee, or by holders of one-third of the amount of outstanding bonds; provides that such meetings shall have power, by extraordinary resolution, "to sanction any modification or compromise of the rights of the bondholders against the company or against its property, whether such rights shall arise under the bonds or trust deed, or otherwise," and provides that such extraordinary resolution may be passed by the vote of holders of a majority of the outstanding bonds.

Evidence was introduced upon the trial tending to establish the following facts: Default was made in the payment of the interest coupons maturing January 1, 1894, and again in the payment of the interest coupons maturing July 1, 1894, and no part of the interest on these coupons was ever paid. After such default had continued for three months, the plaintiff, by notice in writing to the company, demanded the payment of the principal of the bonds as well as the interest. Shortly after the maturing of the second coupons, and when it was supposed that they would not be paid, and that by reason of the continued default the principal sum of the bonds might be declared payable by the bondholders or the trustee, David G. Yuengling, who was the principal stockholder of the corporation, entered into an agreement with John F. Betz, which had for its object the purchase of a sufficient number of the bonds to enable Betz, in conjunction with Yuengling, and some of his relatives and friends, who were likewise bondholders, to control three-fourths in value of the outstanding bonds of the series. The agreement provided that Betz should purchase a sufficient amount to control proceedings in foreclosure; that, if any of the coupons maturing subsequently to January 1, 1895, should be in default, Yuengling would personally pay such coupons on all of the bonds purchased by Betz; that Betz should hold all bonds purchased by him subject to the right of Yuengling, at any time before their maturity, to demand and receive an absolute transfer thereof, together with all unpaid interest coupons, upon the repayment of all moneys advanced by Betz, with interest at 6 per cent.; and that Betz would not transfer or dispose of any of the bonds thus to be purchased in any other manner until the option above mentioned should have expired. Pursuant to this agreement, Betz commenced and continued to pur-

chase bonds until in December, 1894, he had acquired them to the amount of $594,600. December 1, 1894, Betz, with the holders of other bonds, which, with his, were of the amount of $728,100, executed an instrument which, in substance, after reciting the inability of the company to pay its coupons, and that it would be for the best interests of the company and its bondholders to postpone the time of payment of all coupons attached to the bonds, whether past due or to become due on or before July 1, 1896, evidenced their request and consent that the company and the trustee in the deed of trust execute an agreement providing for postponing until January 1, 1900, the time for the payment of all coupons attached to the bonds of the series, whether past due or to become due and payable on or before July 1, 1896. This agreement is signed by Mr. Betz for $594,-600 of the bonds, by Yuengling for $18,800, by the estate of Yuengling's father for $10,000, and by the wife of Yuengling for $70,700. Thereafter an agreement such as was authorized by the consent was executed between the company and the trustee. December 29, 1894, a majority of bondholders composed of the same persons who executed the consent, at a meeting called pursuant to the provisions of the trust deed, voted an extraordinary resolution suspending the fourth condition of the bonds until January 1, 1900. No evidence was introduced tending to show that there had been any material change in the circumstances of the company since the creation of the bonds, or that the ultimate security of the bondholders would be promoted by waiving the default in the payment of interest and deferring the enforcement of the security. There was no consultation with the minority stockholders prior to the execution of the consent. The ruling of the trial judge proceeded upon the theory that the consent of the holders of three-fourths in value of the outstanding bonds operated to extend the time of payment of the interest and principal of the bonds, and he refused to submit to the jury the question whether the consent was made bona fide by the bondholders who were parties thereto.

We cannot doubt that a consent to postpone the payment of the demands of the minority bondholders, made collusively by majority bondholders for the purpose of defeating the remedy of the minority, and not in the exercise of an honest discretion in the general interest, is not a consent within the meaning of the eleventh condition; or that a vote at a meeting of bondholders, sanctioning a modification of the rights of the bondholders, passed by a corrupt majority for the purpose of effectuating such a collusive consent, is not within the power contemplated by the provision in the trust deed.

Community of interest, whether in the case of partners or security holders, creates mutual obligation, and imposes upon all persons occupying that position the duty of acting in the utmost good faith towards the interests of their associates. Upon this principle it was declared in Jackson v. Ludeling, 21 Wall. 617, that a holder of certain bonds, part of a series secured by a corporate mortgage, had no right to employ them as an instrument by which he could make an illegitimate profit out of the mortgaged property at the expense of the other bondholders. The court used this language:

"When two or more persons have a common interest in a security, equity will not allow one to appropriate it exclusively to himself, or to impair its worth to others. Community of interest involves mutual obligation. Admitting, then, that Gordon had a right to make use of the mortgage to enforce the payment of the bonds which he held, he had no right so to use it as to obtain an advantage for himself over the other bondholders. He had no right to employ it as an instrument by which he might become the owner of the property mortgaged at the lowest possible price at which it could be obtained, leaving the bonds held by his associate holders unpaid. His duty, if he used it at all, was to make it productive of the most that could be obtained for all who were interested in it; and if he sought to make a profit at the expense of those whose rights in it were the same as his own, he was unfaithful to the relation he assumed, and was guilty of fraud."

The law would not tolerate any agreement made in advance by such associates intended to permit the relaxation of a duty which is enjoined by good morals and the highest expediency, and every presumption is against the supposition that contracting parties intend a compact which the law condemns. Agreements between bondholders lodging in the majority in interest the power of control over the common fund contemplate that those having the largest interest in its conservation will be the most zealous. They are intended to minimize the power of a factious minority to thwart the general good. But every delegation of power implies that it will be honestly exercised. In discussing a reorganization agreement, by the terms of which the bondholders covenanted that a majority of the holders of the outstanding bonds might purchase the mortgaged premises at foreclosure, and that the new company should be organized upon such terms and in such manner as the majority holders should direct, the supreme court said:

"The agreement, though unusual, was a reasonable one. While it prevented a small minority of the bondholders from forcing unreasonable and inequitable concessions from the majority, it did not empower that majority to crush out the rights of the minority or to put them at any disadvantage. It authorized only such arrangements as would inure equally to the benefit alike of the majority and the minority." Sage v. Railroad Co., 99 U. S. 334.

Powers in trust deeds, conferred on a majority of bondholders, to bind the minority, have been the subject of consideration in several cases in the English courts, and were given full effect. In these cases the power was contained in a provision, similar to that in the present trust deed, by which the bondholders at a meeting, by extraordinary resolution, were authorized to sanction any modification or compromise of the rights of the bondholders against the company or its property. It was assumed by the court in all of these cases that the power was only called into existence when required by the exigencies of the situation, and when exercised must be exercised in good faith. Mercantile Investment & General Trust Co. v. International Co. of Mexico [1893] 1 Ch. 484, note; Mercantile Investment & General Trust Co. v. River Plate Co. [1894] 1d. 596; Follit v. Eddystone Granite Quarries [1892] 3 Ch. 75; Sneath v. Gold Co. [1893] 1 Ch. 477.

Applying these conclusions to the facts of the present case, it must be held that, if the consent was made and the resolution passed by the majority of bondholders, not in the common interest of all,

but in the interest of Yuengling, with a view of enabling him, by deferring for five years the payment of interest, to compel the minority bondholders to sell their bonds on such terms as he might dictate, it was a corrupt and unwarranted exercise of the power of the majority.

The fact that Betz purchased the bonds in the interest of the principal stockholder of the company, and for the purpose of controlling the rights of the minority bondholders, is important only as it serves to throw light upon the bona fides of the consent and vote. He had a right to make the purchase, and, having acquired title to the bonds, succeeded to all the rights of an ordinary bondholder. Yuengling himself might have purchased them, and by doing so would have acquired the same rights. Any purchaser of the bonds was entitled to use them for the purpose of effectuating an honest consent to postpone payments due. But no purchaser could acquire any right to employ them as instruments in a conspiracy to defraud the minority bondholders.

We think the evidence upon the trial presented a question of fact for the determination of the jury, and that the trial judge erred in taking from their consideration the question of the bona fides of the consent and vote.

In conclusion it is proper to say that, inasmuch as all the property of the company is included in the trust deed securing the bonds, the plaintiff's remedy by an action at law would seem to be of little value. He would not be permitted to enforce any lien by execution to the embarrassment of the other bondholders. Pennock v. Coe, 23 How. 117; Fish v. Paper Co., 29 N. J. Eq. 16; Railroad Co. v. Woelpper, 64 Pa. St. 366; Bowen v. Railroad Co., L. R. 3 Eq. 541. The judgment is reversed.