**CIBC BANK AND TRUST COMPANY (CAYMAN) LIMITED, Plaintiff,**

v.

**BANCO CENTRAL do BRASIL, Banco do Brasil, S.A., and Citibank, N.A., in its capacity as agent under the Brazil Multi–Year Deposit Facility Agreement, Defendants.**

94 Civ. 4733 (LAP).

United States District Court, S.D. New York.

May 9, 1995.

Martin London, Paul, Weiss, Rifkind, Wharton & Garrison, New York City, for plaintiff.

Kenneth V. Handal, Arnold & Porter, Washington, DC, Richard F. Lawler, Whitman Breed Abbott & Morgan, and Francis S.L. Wang, Wang & Wang, New York City, for defendants.

## MEMORANDUM AND ORDER

PRESKA, District Judge.

Plaintiff, CIBC Bank and Trust Company (Cayman) Limited ("CIBC"), has brought this action relating to an alleged breach of the Multi–Year Deposit Facility Agreement dated September 22, 1988 (the "MYDFA" or the "Agreement"). Defendants, Banco Central do Brasil (the "Central Bank"), Banco do Brasil, S.A. ("BdB"), and Citibank, N.A., in its capacity as agent under the MYDFA ("Citibank"), have each moved to dismiss the First Amended Complaint (the "Complaint") pursuant to Fed.R.Civ.P. 12(b)(6). Oral argument was held on May 5, 1995. For the following reasons, the Central Bank's motion is granted in part and denied in part; the motions of BdB and Citibank are granted.

## BACKGROUND [1]

The MYDFA is an agreement originally between the nation of Brazil, its Central Bank, and the numerous creditors holding Brazilian sovereign debt. Its purpose was to restructure that debt, and to facilitate an orderly repayment of it, in the wake of Brazil's inability to make timely loan payments during the mid–1980s. Among other things, the MYDFA includes provisions concerning assignment of creditors' MYDFA debt and the potential acceleration of all MYDFA debt in the event of a default if more than 50% of the creditors, calculated by amount of debt holdings, vote for such an acceleration. The Central Bank is an obligor under the MYD-FA; BdB, a Brazilian commercial bank, which is 51% owned by the Brazilian Treasury, is both an obligor under the MYDFA and a creditor Bank; Citibank is the designated agent under the Agreement.

Just a year after the Agreement was consummated, Brazil once again became unable to make regular payments to its creditors. In response, the parties to the MYDFA embarked on yet another significant restructuring, this time of the MYDFA debt. These negotiations were conducted on the part of the creditors through the Bank Advisory Committee for Brazil (the "BAC"), a body consisting of sixteen large creditors charged with "acting as a communications link between Brazil and the International Financial Community." (MYDFA Section 1.01 at I–8.) These negotiations resulted in a significant restructuring of the MYDFA debt pursuant to the model suggested by then-Secretary of the Treasury Nicholas Brady. Under this new Brady-type plan (the "1992 Financing"), creditors could exchange their MYDFA debt for new debt instruments with principals due in 30–year maturities. When the 1992 Financing closed on April 15, 1994, nearly all of the MYDFA debt was so converted.

Two creditors, both of which are parties to this action, did not convert their MYDFA debt at the closing of the 1992 Financing. First, the beneficial owners of plaintiff's MYDFA debt, various trusts representing the interests of the Dart family (the "Darts"), refused to exchange their MYDFA debt for new instruments. According to the Complaint, creditors originally were provided with an option of six types of debt instruments, including uncollateralized capitalization bonds ("C–Bonds"). The Darts, through the then-holders-of-record, Bankers Trust (Cayman) International ("Bankers Trust"), Bear Stearns Global Asset Trading, Ltd. ("Bear Stearns"), and Salomon Brothers International Limited ("Salomon"), elected to take all of their MYDFA debt in the form of C–Bonds. Brazil rejected this request, asserting that such an election violated the guidelines of the 1992 Financing. Thwarted from receiving the instruments they wanted, the Darts refused to convert their MYDFA debt of approximately $1.4 billion at the April 15, 1994 closing of the 1992 Financing.

The other creditor that did not fully convert its MYDFA debt was BdB. BdB, itself an obligor under the MYDFA, was also an original creditor Bank under that Agreement. At the April 15, 1994 closing, BdB converted all of its MYDFA debt except approximately $1.6 billion, which it continued to hold under the MYDFA. According to the Complaint, Brazilian officials ordered BdB to retain that amount of MYDFA debt in order to ensure that the Darts would not hold a majority of the remaining MYDFA debt, and, thereby, have the opportunity to declare an acceleration under the acceleration provisions of the Agreement. (Complaint ¶ 53.)

As evident. from the discussion above, CIBC was not always the holder-of-record for the Dart family. Indeed, it was on May 25 and 26, 1994, after the close of the 1992 Financing, that the previous holders-of-record, Bankers Trust, Bear Stearns, and Salomon, submitted assignment documents for the Dart MYDFA debt. CIBC submitted an "Agreement to be Bound" pursuant to the terms of the Agreement on May 25, 1994. The Central Bank, arguing that the assignment must be to the Darts themselves, rejected those assignments in June, 1994. After the thirty-day waiting period mandated

---

1. The following background includes facts that are not set out in the Complaint or in the Attachments thereto. Provided only for purposes of understanding the underlying transaction, those facts not contained in the Complaint, of course, will not be relied upon in deciding the motions.

by the MYDFA assignment provision, CIBC filed this action seeking the accrued but unpaid interest pursuant to the terms of the MYDFA and seeking to accelerate the entire principal amount owed.

The Complaint alleges eight separate claims in connection with the alleged breach of the CIBC MYDFA debt. Claim One alleges that the Central Bank is liable for breach of contract for the accrued but unpaid interest. Claim Two alleges that the Central Bank is liable for breach of contract relating to a written correspondence from the Central Bank's counsel to the Darts' counsel promising to pay the past interest due at or about the time of the closing of the 1992 Financing. Claim Three alleges that the Central Bank is liable for indemnification of the costs incurred due to the alleged breach pursuant to the indemnification provisions contained in the MYDFA. Claim Four names all three defendants and seeks a declaration that CIBC has the right to trigger acceleration of the MYDFA principal without the consent of any other creditor. Claim Five alleges that the Central Bank is liable for breach of an implied covenant of good faith and fair dealing as to the Central Bank's actions taken to prevent CIBC from declaring an acceleration. Claim Six alleges the same cause of action against BdB. Claims Seven and Eight allege that the Central Bank and BdB, respectively, are liable in tort for interfering with the other defendant's performance relating to the refusal to declare an acceleration.

The Central Bank and BdB each have moved to dismiss the complaint pursuant to Fed.R.Civ.P. 12(b)(6). Citibank has made a conditional motion requesting that it be dismissed if the Fourth Claim is dismissed on the other defendants' motions. In addition to the parties' submissions, the BAC has submitted a brief *amicus curiae* urging me to grant the defendants' motions. Finally, the United States has submitted a Statement of Interest pursuant to 28 U.S.C. § 517 also arguing that I should dismiss the Complaint.

**2.** The MYDFA is attached to the Complaint as

## DISCUSSION

### I. Standard for a Motion to Dismiss

Motions to dismiss pursuant to Fed. R.Civ.P. 12(b)(6) are designed to test the legal sufficiency of a plaintiff's claims. In construing such a motion, I must accept all material facts alleged in the plaintiff's complaint as true and must draw all reasonable inferences in the plaintiff's favor. *See Hertz Corp. v. City of New York*, 1 F.3d 121, 125 (2d Cir.1993), *cert. denied*, —— U.S. ——, 114 S.Ct. 1054, 127 L.Ed.2d 375 (1994). As plaintiff correctly has pointed out, dismissal is not appropriate "unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson*, 355 U.S. 41, 45–46, 78 S.Ct. 99, 102, 2 L.Ed.2d 80 (1957). In deciding a Rule 12(b)(6) motion, I may consider only those matters contained in the complaint, the documents attached to the complaint,[2] and matters of which I may take judicial notice. *See Valmonte v. Bane*, 18 F.3d 992, 998 (2d Cir.1994).

Defendants' motions argue that plaintiff's complaint must be dismissed in its entirety. They assert two arguments that apply to every claim and then make other arguments that relate to each claim separately. The two "global" defenses, which argue that the assignment to CIBC was (1) not effective under the MYDFA and (2) violated the New York champerty statute, will be addressed first. The arguments relating to each individual claim will follow in turn.

### II. Defenses Relating to All Claims

#### A. *Improper Assignment*

The defendants' first argument is that CIBC does not have standing to bring this action because the assignment to CIBC of the Darts' MYDFA debt was not effective under the assignment provisions of the MYDFA. Pursuant to Section 12.10 of the MYDFA, any creditor Bank may assign all or part of its position in the MYDFA to any person, provided that the assigning bank submit a signed assignment notice and that the assignee Bank submit an "Agreement to be Bound." Assignees that are non-financial

Exhibit A.

institutions are required to submit an Agreement to be Bound that includes a Notice that the debt "may be subject to restructuring as if such non-financial institution Assignee were a financial institution." (MYDFA Section 12.10.) Upon proper assignment, the Central Bank would reflect the change in holding on the MYDFA records after a thirty-day waiting period.

In this case, CIBC has alleged that the three investment banks issued the required Notice of Assignment and that CIBC, a financial institution, issued the required Agreement to be Bound. (Complaint ¶¶ 68–79.) The defendants rejected the assignment, however, arguing that the debt could only be registered in the name of the Darts themselves and that the Darts, who obviously are a non-financial institution, would be required to submit the Agreement to be Bound with the additional Notice that the debt could be restructured as if the Darts were a financial institution. The defendants argue that the additional requirements for non-financial institutions under the MYDFA assignment provision would be meaningless if a non-financial institution, like the Darts, simply could engage a financial institution, like CIBC, to hold the debt on their behalf. The defendants argue, therefore, that under the terms of the MYDFA, the assignment to CIBC was improper and that the assignment should have been made directly to the Darts, or, at the very least, that the Darts should be required to submit the additional Notice in their Agreement to be Bound. Because CIBC and the Darts did not meet these additional requirements, defendants argue, the assignment was ineffective, and CIBC

has no standing to sue on the Darts' MYDFA debt.[3]

In response to the defendants' arguments, CIBC argues that a situation by which one party acts as the holder-of-record for another is common practice and is contemplated by the terms of the MYDFA itself. CIBC alleges, for example, that the Central Bank's assertion that CIBC cannot hold the MYDFA debt for the Darts is "inconsistent with prior statements by the Central Bank and its representatives, with past practice under the MYDFA, and with general practice under sovereign debt instruments." (Complaint ¶ 80.) CIBC goes on to argue that the MYDFA's language authorizes the holding by one party on behalf of a beneficial holder. Section 12.10(b)(iv), CIBC points out, states that "[n]othing in this Section 12.10 shall prevent any Bank from granting participations in its rights under this agreement." (MYDFA Section 12.10(b)(iv).) CIBC alleges that its relationship with the Darts is just such a participation and that the fact the Darts hold the beneficial interest in the MYDFA debt in question in no way affects the validity of the assignment. (Complaint ¶ 81.)

■ Examining the MYDFA assignment section as a whole, and taking CIBC's allegations as true, as I must, I cannot say as a matter of law that the assignment to CIBC was improper. I note in particular the fact that "participations" expressly are provided for in the provision and that the term "assign" under the provision is defined broadly: "'assign' means assign or otherwise transfer, whether or not resulting, as a matter of law, in the assignee or transferee being a direct creditor of an obligor...."[4] (MYDFA Section 12.10(c).) The intended scope of the

3. Defendants argue that the MYDFA is a personal credit and confidence agreement and is, therefore, unassignable unless the assignment provisions are followed strictly. Because I conclude that CIBC successfully has alleged that the assignment was carried out pursuant to the Agreement's terms, I need not decide the general assignability of the MYDFA debt.

4. The Central Bank argues that this broad definition of assignment supports its position. This argument, articulated for the first time at oral argument, reasons that the broad scope of assignment must lead to a conclusion that the Darts are themselves assignees under the MYD-

FA. Under this reasoning, the MYDFA contemplates a situation in which more than one party can be considered an assignee of the same debt, and that each one would be required to submit the appropriate Agreements to be Bound. Despite this slightly different cast on its improper party argument, the issue in contention at its core is exactly the same: whether the MYDFA allows a party to circumvent the additional assignment requirements necessary for a non-financial institution by engaging a financial institution to hold the MYDFA debt. As discussed in the text, this issue cannot be resolved by looking only at the language of the MYDFA.

terms "participation," which is undefined in the MYDFA, and "assign," which is defined broadly, is ambiguous and may permit relationships such as the one between CIBC and the Darts, particularly given CIBC's allegations that such relationships are common practice. I note that the Darts' long-standing relationship with the assignor investment banks seem to have been exactly the same as the one between CIBC and the Darts, yet those relationships were never challenged by the defendants. Although the defendants' arguments that recognition of the assignment would allow easy circumvention of the additional requirements placed on non-financial institutions makes sense logically, and yet may prove to be the correct interpretation of the MYDFA, the assignment provision is not so unambiguous to overcome the allegations of plaintiff and its plausible interpretation at this stage in the litigation. For purposes of this motion, therefore, the assignment to CIBC of the Darts' MYDFA debt will be treated as fully effective under the MYDFA.

### B. *Champerty*

■ Defendants' second "global" defense is that, even if proper under the MYDFA, the assignment to CIBC violated the anti-champerty provisions of the New York [5] Judiciary Law and, therefore, should be declared void. Section 489 of the New York Judiciary Law provides, in relevant part, that

> [n]o ... corporation or association directly or indirectly, shall solicit, buy or take an assignment of, or be in any manner interested in buying or taking an assignment of a bond, promissory note, bill of exchange, book debt, or other thing in action, or any claim or demand, with the intent and purpose of bringing an action thereon.

N.Y.Judiciary Law § 489 (McKinney 1983). A plaintiff who acquires a claim in violation of this provision may not recover on the claim—indeed, assignments made in violation of this provision are void. *See Refac Int'l, Ltd. v. Lotus Development Corp.*, 131 F.R.D. 56, 58 (S.D.N.Y.1990); *Koro Co. v. Bristol–Myers Co.*, 568 F.Supp. 280, 288 (D.D.C.1983) (interpreting New York law) (citing cases).

Defendants argue that the complaint itself demonstrates that the transfer to CIBC was made "with the intent and purpose of" having CIBC bring an action on the MYDFA debt.[6] Defendants point out, for example, that all of the alleged breaches as to unpaid interest occurred while CIBC's "predecessors in interest" held the debt. *See, e.g., American Restaurant China Manufacturers Assoc., Inc. v. Corning Glass Works*, 24 Misc.2d 634, 198 N.Y.S.2d 366, 370–71 (N.Y.Sup.Ct.Erie Co.1960) (allegations that damages caused by

---

5. Pursuant to Section 12.11, the MYDFA "shall be governed by, and construed in accordance with, the laws of the State of New York, United States." (MYDFA Section 12.11.)

6. The parties disagree as to whether the defendants must show that the assignment was *solely* for the purpose of bringing suit or whether a showing that the *primary* purpose of the assignment was to bring suit would be sufficient. Both sides cite cases supporting their positions. *Compare Aubrey Equities, Inc. v. SMZH 73rd Associates*, 622 N.Y.S.2d 276, 278 (1st Dep't 1995) (commencement of suit must be primary purpose); *Wainco Funding v. Logiudice*, 199 A.D.2d 950, 606 N.Y.S.2d 86, 88 (3rd Dep't 1993) (same); *Capobianco v. Halebass Realty, Inc.*, 72 A.D.2d 804, 421 N.Y.S.2d 924, 925 (2nd Dep't 1979) (same) *with Banque de Gestion v. La Republica de Paraguay*, 787 F.Supp. 53, 56 (S.D.N.Y. 1992); (under New York law champerty is established if sole reason for assignment was to bring suit); *Koro*, 568 F.Supp. at 287 (same) (interpreting New York law); *Prudential Oil Corp. v. Phillips Petroleum Co.*, 69 A.D.2d 763, 415 N.Y.S.2d 217, 218 (1st Dep't 1979) (same); *Andrias v. National Surety Corp.*, 98 Misc.2d 292, 413 N.Y.S.2d 820, 821 (1st Dep't 1978) (same). The confusion on this issue seems to have been created by a New York Court of Appeals decision that endorses both standards. In *Fairchild Hiller Corp. v. McDonnell Douglas Corp.*, 28 N.Y.2d 325, 321 N.Y.S.2d 857, 860, 270 N.E.2d 691, 693 (1971), the Court of Appeals favorably cites two older decisions: one holding that the champerty rule "implies an exclusion of any other purpose," *Moses v. McDivitt*, 88 N.Y. 62, 65; and a second holding that "the statute is violated only if the primary purpose" of the assignment is to bring suit. *Sprung v. Jaffe*, 3 N.Y.2d 539, 169 N.Y.S.2d 456, 460, 147 N.E.2d 6 (1957). Cases following *Fairchild Hiller* have cited the case for both propositions. *See, e.g., Koro Co.*, 568 F.Supp. at 287 (citing *Fairchild Hiller* for solely standard); *Wainco Funding*, 606 N.Y.S.2d at 88 (citing *Fairchild Hiller* for primary standard). I need not decide this issue now, however, because I cannot conclude, at this stage of the proceedings, that the Complaint demonstrates that the assignment was made for the purpose of bringing suit under either standard.

"plaintiff's assignors" is evidence of champertous assignment). They also note that suit was brought by CIBC on the very first business day that it could have after the MYDFA-mandated thirty-day waiting period.

■ At this stage of the proceedings, I cannot say as a matter of law that the assignment to CIBC was champertous. To demonstrate champerty, a defendant must show that the assignment was made with the intent and purpose of bringing suit, a decidedly fact-specific inquiry. *See Fairchild Hiller,* 321 N.Y.S.2d at 860 ("[T]he question of intent and purpose of the purchaser or assignee of a claim is usually a factual one to be decided by the trier of facts. . . ."). Though I note that courts interpreting the New York champerty statute on occasion have found a champertous assignment on a motion to dismiss, *see Refac International,* 131 F.R.D. 56; *American Restaurant,* 198 N.Y.S.2d 366, I conclude that such a finding would be inappropriate in this case. There is no doubt that, given the timing of the filing of suit in this case, it could be inferred that one of the purposes of the assignment was to bring suit. Based on the complaint, however, there is reason to infer that other functions go along with service as holder-of-record. Bear Stearns, Bankers Trust and Salomon, the predecessor holders-of-record, collected MYDFA debt payments, distributed the payments to the beneficial owners and served as agent for the Darts in matters relating to the MYDFA. Presumably, CIBC will serve these roles as well. I simply cannot say, at this stage, that the assignment to CIBC was champertous.

## III. Claim-by-Claim Analysis

### A. *Claim One: Breach of Contract Against the Central Bank for Past Interest Due Under the MYDFA*

In its first claim, CIBC alleges that the Central Bank has breached the terms of the MYDFA by failing to pay a portion of the required interest payments to its predecessors. The Complaint includes schedules of the unpaid amounts totalling $59,896,859.22.

CIBC alleges that the Central Bank is liable in this amount plus the interest on this amount.

■ The Central Bank does not deny that it has failed to pay these past due amounts.[7] The arguments raised in defense of this claim were (a) improper assignment and (b) the New York champerty statute. After addressing, and rejecting, for now, both of those defenses above, it is clear that CIBC successfully has alleged a cause of action for breach of contract. In sum, CIBC has alleged that it is a proper party to a valid contract, namely, the MYDFA; CIBC has alleged that the Central Bank has breached that contract; and CIBC has alleged that it has damages of approximately $60 million. On a motion to dismiss, these elements are sufficient to state a claim for breach of contract. The Central Bank's motion to dismiss Claim One is denied.

### B. *Claim Two: Breach of Contract Against the Central Bank Based on the Letter of March 17, 1994*

CIBC's second claim alleges that an independent contractual duty arose to pay the past due interest pursuant to a letter sent from Eli Whitney Debevoise II, Esq., the Central Bank's counsel, to the Darts' counsel on March 17, 1994. On March 11, 1994, the Darts' counsel sent the Central Bank's counsel a letter that stated that the Darts "assum[ed] that all amounts of accrued but unpaid interest on the MYDFA through that date (payable to MYDFA holders that are not signatories to the [1992 Financing Plan] Exchange Agreements) will be paid in cash in full not later than April 18, 1994." (Complaint ¶ 92.) The letter went on to request that the Central Bank contact the Darts if their assumption was incorrect. In response to the Darts' inquiry, Mr. Debevoise wrote a letter that stated, in its entirety, the following:

> I have been instructed by Brazil to inform you, in response to your March 11 letter, that on April 15 Brazil will pay MYDFA

---

7. Indeed, at oral argument, the Central Bank conceded that CIBC would have the right to sue for unpaid accrued interest if it were a proper party to the MYDFA. As discussed above, for purposes of this motion to dismiss, I conclude that CIBC is such a proper party.

interest to the MYDFA agent. Brazil reiterates to your client its offer to participate in the 1992 Financing Plan, including with respect to the EI Bond exchange. If your client desires to participate only in the EI Bond exchange, please inform me immediately so the necessary steps may be taken. (Complaint ¶ 93.) The letter contained a "cc" to Dr. Pedro Malan, then-president of the Central Bank. Despite this letter, the interest was not paid on April 15, 1994 or at any time thereafter. CIBC alleges that this letter provides an additional, independently sufficient ground for a claim of breach of contract against the Central Bank.

■ Defendants argue that the promise of payment in the letter cannot be enforced because there was no consideration for the promise—the duty to pay the interest already existed under the MYDFA. As defendants correctly note, it is black-letter law that no consideration is present when the promisor has a pre-existing duty to perform the promise. *See, e.g., Fafoutis v. Lyons,* 149 A.D.2d 565, 540 N.Y.S.2d 20, 21 (2d Dep't 1989) ("A promise to comply with a pre-existing legal duty is not adequate consideration upon which a valid contract may be based."); John D. Calamari & Joseph M. Perillo, *The Law of Contracts* § 4–9 (3d ed. 1987). It is also correct, however, as CIBC points out, that New York contract law has carved out an exception to this general rule. Under New York law, a written acknowledgement by a debtor of a pre-existing debt is independently enforceable without additional consideration. *See United States v. Glens Falls Insurance Co.,* 546 F.Supp. 643, 645 (N.D.N.Y.1982) (Miner, J.) (citing *Scheuer v. Scheuer,* 308 N.Y. 447, 451, 126 N.E.2d 555 (1955)). In most instances, this doctrine is used when the original debt has become uncollectible due to a statute of limitations. *See id.* Despite the different circumstances presented here, lack of consideration provides no defense to this claim.

■ What the parties failed to address in their submissions, however, is that, on the face of the complaint, CIBC has absolutely no connection to the Central Bank's promise contained in the March 17, 1994 letter. The Central Bank's promise to pay the accrued interest in the letter was not made to CIBC; nor was the promise made to any of CIBC's predecessors-in-interest. The promise in the letter was made to the Darts through its counsel. According to the Complaint, however, CIBC received its interest in this action solely from the three investment banks. Unlike the cause of action in Claim One where CIBC successfully alleges that it was a proper obligee to the promises contained in the MYDFA, nowhere in the Complaint is it alleged that CIBC has been assigned any rights in the promises contained in Mr. Debevoise's letter. If we are to believe CIBC's argument that the letter establishes a contractual duty independent of the MYDFA, then CIBC must allege that it has standing, independent to its MYDFA rights, to bring suit on this second promise. Because the Complaint does not allege facts that would demonstrate such standing, plaintiff's second claim must be dismissed.

At oral argument, plaintiff's counsel stated that he was the recipient of the letter, that he represented both CIBC and the Darts, and that the promise was made to both CIBC and the Darts. Counsel offered to amend the complaint to clarify CIBC's connection with this promise and requested leave to do so if necessary. Such amendment is necessary; plaintiff may amend its complaint to demonstrate how CIBC has standing to sue on the letter's promise within thirty days of the entering of this Order.

## C. *Claim Three: Indemnification Under the MYDFA*

CIBC's third claim alleges that the Central Bank is liable for indemnification of CIBC's costs and expenses incurred due to the alleged breach. Two sections of the MYDFA provide for such indemnification. Section 3.07(b), for example, provides, in relevant part, that

> the Central Bank shall indemnify each Bank against any reasonable loss (excluding loss of anticipated profits) or expenses which it may sustain or incur as a result of the failure by the Central Bank to pay when due any principal of, or interest on, any Deposit Account, or any other amount ... payable hereunder....

(MYDFA Section 3.07(b).) Section 12.05(a) provides for the reimbursement of expenses, including counsel fees and court costs, incurred in connection with investigating a possible default or taking action to protect the Bank's rights if a default has occurred. (MYDFA Section 12.05(a).)

Defendants argue that the plaintiff has failed to satisfy the conditions present required to seek such indemnification. Section 3.07 requires that the indemnification must be paid within 20 days of a demand for such indemnification and that each demand shall be accompanied by a recitation of the basis of the belief that payments are past due and an itemization of the loss or expense. (MYDFA Section 3.07.) CIBC does not allege that the demand for indemnification was made or that any itemization was submitted.

 CIBC argues that such demand and itemization would be futile given the allegedly wilful and bad faith conduct of the Central Bank. When a defendant's behavior demonstrates that satisfaction of a condition precedent would be futile, the plaintiff is relieved from satisfying that condition. *See, e.g., Sunshine Steak, Salad & Seafood, Inc. v. W.I.M. Realty, Inc.,* 135 A.D.2d 891, 522 N.Y.S.2d 292, 293 (3d Dep't 1987) ("[W]here it becomes clear that one party will not live up to a contract, the aggrieved party is relieved from the performance of futile acts of conditions precedent."). Futility is inherently a factual inquiry—accepting the plaintiff's allegations of bad faith as true, as I must, CIBC's claim for indemnification survives despite CIBC's failure to provide the requisite notice and itemization. The Central Bank's motion to dismiss this claim is denied.

### D. *Claim Four: Declaration of Acceleration*

CIBC's fourth claim seeks a declaration that CIBC has the authority under the MYDFA to declare an acceleration of the MYDFA principal. Section 10.01 of the MYDFA concerns events of termination of the agreement. Under Section 10.01(a), nonpayment of any amount of principal or interest is considered an "event of termination." That section further provides that, upon the occurrence of any event of termination,

the Agent shall ... at the request, or may with the consent, of more than 50% of the Banks ... by notice to the Central bank and the Guarantor, declare the right and obligation of the Central Bank ... to be terminated, whereupon the same shall forthwith terminate and ... at the request, or may with the consent, of more than 50% of the Banks, by notice to the Central Bank and the Guarantor, declare the entire unpaid principal amount of the Deposit Accounts, all interest accrued and unpaid thereon and all other amounts payable under this Agreement to be forthwith due and payable, whereupon ... the Deposit Accounts, all such accrued interest and all such other amounts shall become and be forthwith due and payable, without presentment, demand, protest or further notice of any kind....

(MYDFA Section 10.01, at X–7 through X–8.) According to the Complaint, on June 27, 1994, CIBC sent a telex to Citibank, as MYDFA Agent, advising it that an event of termination had occurred. (Complaint ¶ 54.) Also on June 27, 1994, CIBC requested and instructed Citibank to declare an acceleration of the MYDFA debt. (Complaint ¶ 112.) Citibank has not declared such an acceleration.

Defendants argue that CIBC does not have the authority under the MYDFA to declare an acceleration. As explained above, the consent of a majority of Banks, calculated by holdings, is required to do so. Defendants argue that CIBC is not a majority holder of the remaining MYDFA debt. Rather, defendants argue that BdB, which holds approximately $1.6 billion of the MYDFA debt, holds the majority of outstanding MYDFA debt and, therefore, CIBC cannot declare an acceleration without BdB's vote. The plaintiff does not dispute that BdB holds more MYDFA debt than CIBC. (Complaint ¶¶ 51, 111; Plaintiff's Memorandum of Law in Opposition to Defendants' Motion to Dismiss the First Amended Complaint ("CIBC Mem.") at 25 n. 14.)

Despite CIBC's acknowledgement that BdB holds more MYDFA debt, CIBC argues that it can declare an acceleration by itself because BdB's share must be disregarded under principles of New York law. CIBC

alleges that BdB retained the $1.6 billion MYDFA debt, at the direction of the Central Bank, in a bad faith maneuver designed to block CIBC's acceleration attempt. CIBC argues that under New York law there is an implied covenant of good faith and fair dealing that prohibits defendants from using the BdB holdings in such a manner. For support of this proposition, CIBC looks to four areas of law: the New York common law of compositions; the federal Bankruptcy Code; the federal Trust Indenture Act of 1939; and the New York Business Corporation Law.

■ A composition is defined as "[a]n agreement, made upon sufficient consideration, between an insolvent or embarrassed debtor and his creditors, whereby the latter, for the sake of immediate or sooner payment, agree to accept a payment less than the whole amount of their claims, to be distributed *pro rata*, in discharge and satisfaction of the whole." *Black's Law Dictionary* 286 (6th ed. 1990); *see In re Clarence A. Nachman Co.*, 6 F.2d 427, 430 (2d Cir.1925). Prior to the adoption of the federal bankruptcy laws, New York developed common law rules to interpret compositions and address the relationships of the parties thereto. Parties to a composition, for example, owe each other a duty of "scrupulous good faith"—the law "enforces wholesome morality, and inculcates the principles of honest and fair dealing by defeating any advantage attempted to be gained, either by working upon the necessities of the debtor, or by colluding with him." *Almon v. Hamilton*, 100 N.Y. 527, 3 N.E. 580, 580 (1885). As part of this body of law, courts applying New York law have disregarded the votes of creditors who were controlled by the debtor in determining whether a composition should be approved. *See, e.g., In re Henry*, 11 F.Cas. 1148, 1150 (S.D.N.Y. 1878) (party who was also creditor had no right to vote on whether composition should be adopted); *In re Hannahs*, 11 F.Cas. 446, 447 (S.D.N.Y.1876) (in vote on whether composition would be adopted, court disregarding shares of creditors obviously voting not in their own interest, but in the interest of the debtor). As defendants point out, under this doctrine, controlled creditors' votes are disregarded when deciding whether the composition would be approved in the first place,

not, as in the instant case, a vote pursuant to the terms of the agreement itself.

The second source for CIBC's good faith and fair dealing argument is the federal Bankruptcy Code. Like the common law of compositions, the Code prevents "insiders" from voting on whether a reorganization plan will be accepted by a class of impaired creditors. *See* 11 U.S.C. § 1129(a)(10). Insiders are defined as entities controlled by, or under common control with, the debtor. *See* 11 U.S.C. §§ 101(2)(B), 101(30)(E). As above, however, this provision affects the determination of whether the reorganization plan will be adopted in the first instance—it does not affect how the reorganization plan should be interpreted once consummated. Moreover, the Code does not apply to foreign sovereign debt. *See* 11 U.S.C. § 109(a).

The third source of CIBC's argument is the Trust Indenture Act of 1939. Under that Act, certain provisions become part of any Trust Indenture unless otherwise excluded. One of those provisions controls which bondholders can vote to determine whether to give consent to any past default and to determine its consequences. That section excludes from the voting those bondholders "owned by any obligor ... or by any person directly or indirectly controlling or controlled by or under direct or indirect common control with any such obligor." 15 U.S.C. § 77ppp(a). The Act explicitly does not apply to foreign sovereign debt, however. *See* 15 U.S.C. § 77ddd(a)(6).

CIBC's final source for its proposition that BdB's share must be disregarded is the New York Business Corporation Law. Under § 612(b) of the Business Corporation Law, a New York Corporation cannot vote reacquired shares, nor can a subsidiary vote shares held in the parent corporation. *See* N.Y.Bus.Corp.Law § 612(b).

■ Based on these four sources, CIBC argues that, as part of an implied covenant of good faith and fair dealing under the MYDFA, BdB's share of the MYDFA debt should be disregarded when calculating whether an acceleration should be declared. Though CIBC concedes that it has found no case suggesting such an application of an implied

covenant of good faith and fair dealing,[8] it asks me to apply such an implied covenant in this case. (CIBC Mem. at 37.)

I find CIBC's argument, while quite creative, wholly unpersuasive. The law of compositions and the Bankruptcy Code provide little or no support to plaintiff's claim; it is unremarkable that an entity controlled by the debtor should not be allowed to vote on whether the composition or reorganization plan—instruments that *define* the debtor-creditor relationship—should be adopted. To allow such voting would alter the relative bargaining strengths of the debtor and his or her creditors in such reorganization negotiations. In the instant case, on the other hand, the issue revolves around whether BdB should be able to exercise rights that are already set out in the provisions of the existing "composition," *i.e.*, the MYDFA.

The Trust Indenture Act, though more squarely on point, is no more helpful to CIBC. The provisions of the Act concededly are not applicable to sovereign debt instruments and can be excluded from even those indentures that do fall under the scope of the Act. Moreover, as suggested by defendants, I find the *absence* of the Act's exclusion provisions in the MYDFA just as persuasive as the rationale behind those provisions: if the drafters of the MYDFA wished to have such a covenant in the Agreement, in the words of the BAC, "they would have had to look no further for precedent than the Trust Indenture Act" for language to accomplish their goal. (Memorandum of Law of the Bank Advisory Committee for Brazil ("BAC Mem.") at 11–12.)

Finally, I find the New York corporations law totally inapposite to the case at bar—the provisions cited by CIBC are as distant in terms of reasoning as New York is from Brazil in terms of geography. Simply stated, the interests engaged are much different: the shareholders of a corporation have the statutory right to make various decisions concerning the corporation, and the statute, not surprisingly, prohibits the officers of the corporation from usurping those rights. *See Norlin Corp. v. Rooney, Pace Inc.*, 744 F.2d 255, 262 (2d Cir.1984) ("If cross-ownership and cross-voting of stock between parents and subsidiaries were unregulated, officers and directors could easily entrench themselves by exchanging a sufficient number of shares to block any challenge to their autonomy."). The MYDFA is not a corporation, however, and no particular party to the Agreement is entitled by statute to control how the plan is effectuated. Instead, like any contract, the rights of the parties are defined by the Agreement itself. The New York Business Corporation Law provides no guidance on how to interpret that Agreement.

In sum, the implied covenant sought by plaintiff would not merely complement the

---

**8.** The case relied upon most heavily by plaintiff at oral argument, *Hackettstown National Bank v. D.G. Yuengling Brewing Co.*, 74 F. 110 (2d Cir. 1896), is distinguishable. In that case, which is not cited in CIBC's papers on this motion, the Circuit Court of Appeals addressed a situation in which a corporate bondholder was acting at the direction of the corporation's officer. Under the terms of the bond agreement, a majority of the bondholders could sanction a modification of the bondholders' rights against the corporation. *See id.* at 111. The court held that a bondholder who was controlled by the corporate officer could not use his bonds for the purpose of defeating the remedy of the minority. *See id.* at 112, 114. CIBC relies on this case, which was cited favorably in the Congressional debates concerning the Trust Indenture Act, as a common law basis for its good faith and fair dealing argument.

*Hackettstown* is distinguishable from the instant case on two important grounds. First, as pointed out by defendants, *Hackettstown* concerned a vote in which the bondholders were modifying the rights of the parties involved; as discussed in the section of the text dealing with compositions and Bankruptcy Code reorganizations, it is unremarkable that a controlled party should be excluded from a vote that *defines* the debtor-creditor relationship itself. Second, and more significantly, *Hackettstown* addressed a case in which the controlled party surreptitiously acquired his interest *after* the bond agreement had been consummated. In the instant case, on the other hand, the drafters of the MYDFA were aware that BdB was a creditor and were aware that BdB was controlled by Brazil. Moreover, BdB has not changed its position since the MYDFA was signed by acquiring more debt. In sum, the controlled party in *Hackettstown* changed its position in an effort to alter fundamentally the terms of the debtor-creditor relationship; in the instant case, BdB has not changed position and is attempting only to exercise the rights that were, from the beginning, set out explicitly in the MYDFA.

express provisions contained in the Agreement, it would change those provisions and significantly alter the rights of the parties. I refuse to make such an extreme leap on the basis of the cited "sources"—to do so would change the substantive rights of the parties and impair the ability of both debtors and creditors to order their relationships through contractual debt agreements. *See Hartford Fire Insurance Co. v. Federated Dep't Stores, Inc.*, 723 F.Supp. 976, 991 (S.D.N.Y. 1989) ("Nor can a court imply a covenant to supply additional terms for which the parties did not bargain."); *Carlock v. Pillsbury Co.*, 719 F.Supp. 791, 819 (D.Minn.1989) (under New York law, covenant of good faith and fair dealing does not create "independent substantive rights").

Even if I concluded that CIBC's suggested implied covenant were appropriate, it would provide CIBC no assistance in this case. It is axiomatic that an implied covenant cannot override the express provisions of a contract. In the words of the New York Court of Appeals, "the implied obligation is in aid and furtherance of other terms in the agreement of the parties. No obligation can be implied, however, which would be inconsistent with other terms of the contractual relationship." *Murphy v. American Home Products Corp.*, 58 N.Y.2d 293, 461 N.Y.S.2d 232, 237, 448 N.E.2d 86, 91 (1983); *see Hartford Fire*, 723 F.Supp. at 991; *see also Metropolitan Life Insurance Co. v. RJR Nabisco*, 716 F.Supp. 1504, 1517 (S.D.N.Y.1989) ("In contracts like bond indentures, an implied covenant derives its substance directly from the language of the Indenture, and cannot give the holders of Debentures any rights inconsistent with those set out in the Indenture." (internal quotations omitted)). In this instance, it is clear that the provisions of the MYDFA expressly allow BdB to retain MYDFA debt and to vote its share of that debt in order to hinder an attempt at acceleration by another creditor.[9]

The assignment provision of the MYDFA, Section 10.01, states that acceleration can be triggered "at the request, or with the consent, of more than 50% of the Banks...." (MYDFA Section 10.01 at X–7.) The method of calculating percentages is set out in the definitions section of the MYDFA. For example,

> *"Banks"* preceded by "____% of the" means, at the time of determination, Banks which hold the specified percentage of ... the then aggregate unpaid principal amount of the Interim Deposits and Existing DFA Deposits held by all Banks (other than (A) Interim Deposits or Existing DFA Deposits which are considered paid pursuant to Section 2.05(b) and (c) and (B) Interim Deposits as to which a Guaranteed Affected Debt Notice and a related Rejection Notice have been timely given)....

(MYDFA Section 1.01 at I–9.) The term "Bank" is defined as "(i) each Original Bank and each Adopting Bank, and (ii) any successor or permitted assignee of such person." In this case, there is no dispute that BdB was an Original Bank under the MYDFA.[10] Nor is there any dispute that BdB holds unpaid principal of MYDFA deposits. (Complaint ¶¶ 51, 111; CIBC Mem. at 25 n. 14.) Under the very terms of the Agreement, as noted above, *all* such Banks' shares are to be included when calculating percentage. This plain statement of the Agreement's intent would be sufficient by itself to prohibit exclusion of BdB's holdings.

Several other sections of the MYDFA also support this view. Based on the terms of the MYDFA, there can be no question that the relationship between Brazil and BdB was known by the parties to the MYDFA. Pursuant to Section 11.04,

> Each Bank represents and warrants and agrees to and with each other Bank [that] ... [s]uch Bank is familiar with such matters (including, without limitation, the economic and financial condition of the Central Bank and the Guarantor [Brazil]) as in its opinion may affect the performance by the Central Bank and the Guarantor of

---

9. For a discussion of BdB's discretion to choose not to accelerate, see *infra* Section III.E.

10. CIBC made it clear at oral argument that it does not dispute that BdB was an Original Bank

or that BdB is in the same position now, as far as debt holdings, as it was when the MYDFA was consummated.

their respective obligations hereunder and in that condition has made its own independent appraisal of the economic affairs, financial condition, foreign exchange and reserve holdings, prospective foreign exchange income and holdings, creditworthiness, condition, affairs, status and nature of the Central Bank and the Guarantor.

(MYDFA Section 11.04(a).) Under this section, the Banks further represent that the

> Bank is aware that each other Bank ... may have, in addition to this Agreement, existing credit relationships with the Central Bank, the Guarantor, Governmental Agencies and other Persons ... and that in many cases these existing relationships are substantial and in some cases involve existing agency or similar responsibilities of such other Bank.... Such Bank acknowledges and accepts that such other relationships in fact exist and that the nature and extent of such other relationships have not been specifically disclosed to such Bank....

(MYDFA Section 11.04(c).) In addition to these representations and acknowledgements, BdB is appointed by the MYDFA as the Central Bank's agent for service of process in New York. (MYDFA Section 12.07(a)(ii).) Given these provisions, and given that CIBC has made no allegations that BdB attempted to hide the fact that the Guarantor (Brazil) owned 51% of the BdB voting stock, it is clear that the parties to the MYDFA were aware of BdB's relationship, yet made no provision for excluding BdB's holding from the acceleration calculation. Though not an original signatory of the MYDFA, CIBC is as bound by these provisions as if it were. *See Citibank, N.A. v. Tele/Resources, Inc.*, 724 F.2d 266, 269 (2d Cir.1983) (assignee steps into shoes of assignor); *State Bank of India v. Walter E. Heller & Co.*, 655 F.Supp. 326, 331 (S.D.N.Y.1987) ("An assignee 'is subject to all the equities and burdens which attach to the property assigned because he receives no more and can do no more than his assignor.'" (quoting *International Ribbon Mills, Ltd. v. Arjan Ribbons, Inc.*, 36 N.Y.2d 121, 365 N.Y.S.2d 808, 811, 325 N.E.2d 137, 139 (1975)).

Other provisions of the MYDFA suggest that the drafters expressly would have excluded BdB's share had they so intended. First, the MYDFA mentions BdB elsewhere in the document when separate treatment was warranted. (MYDFA Section 10.01(e)(iii) (discussing BdB's status as an Other Obligor).) Second, as noted above, the percentage calculation provision specifically excluded certain deposits from calculation; it just as easily could have excluded specific Banks if that was the intention. (MYDFA Section 1.01 at I–9.) Third, and perhaps most significantly, the drafters of the MYDFA expressly contemplated a situation in which one bank would be owned by another entity. The term "Parent Bank," for example, is defined as "a single bank or other financial institution which owns, directly or indirectly, more than 50% of the issued and outstanding capital stock having ordinary voting rights of such Bank and which is itself not a subsidiary of any other bank or financial institution." (MYDFA Section 1.01 at I–47.) Despite this explicit evidence that the drafters considered a situation in which one bank would be controlled by another entity, they took no steps to exclude or otherwise treat differently the controlled banks in calculating the acceleration percentage. As stated by the Court of Appeals, "[a] promise by the defendant should be implied only if the court may rightfully assume that the parties would have included it in their written agreement had their attention been called to it." *Neuman v. Pike*, 591 F.2d 191, 195 (2d Cir.1979). In the instant case, as in *Neuman*, "[a]ny such assumption would be completely unwarranted." *Id.*

In sum, because of the clear language of the MYDFA percentage calculation provision, the parties' knowledge of BdB's relationship with the Central Bank and Brazil, and the other MYDFA provisions that suggest that BdB's share would have been excluded expressly if the drafters wished its share excluded at all, I conclude as a matter of law that CIBC's fourth claim must be dismissed. The motions of all three defendants as to Claim Four are granted.

**E. *Claims Five and Six: Breach of Good Faith and Fair Dealing Against the Central Bank and BdB***

Claims Five and Six allege breach of the covenant of good faith and fair dealing against the Central Bank and BdB, respectively, for each party's role in thwarting CIBC's attempts at accelerating the MYDFA debt. The Complaint alleges that the Central Bank "breached, and continues to breach, the implied covenant of good faith and fair dealing by attempting to block CIBC and other legitimate MYDFA holders from exercising their rights to seek repayment of interest and principal through the remedy of acceleration as set forth in MYDFA Section 10.01." (Complaint ¶ 120.) The Complaint also alleges that BdB "withdrew its prior commitment of MYDFA debt from the 1992 Financing Plan in an avowed effort to prevent CIBC (and its predecessors-in-interest) from effecting an acceleration and collecting the sums owed to it." (Complaint ¶ 126.)

As I found above, however, BdB's holdings give it the right to be counted when calculating the share needed to trigger acceleration. The MYDFA acceleration section provides that 50% of the Banks, calculated by holdings, must give their consent to the declaration of acceleration. Implicit in the concept of providing one's consent is the discretion to withhold such consent. *See New Bank of New England, N.A. v. Toronto–Dominion Bank,* 768 F.Supp. 1017, 1021 (S.D.N.Y.1991) ("[W]here the participation agreement 'specifically granted the [selling bank] authority to determine when to foreclose,' the selling bank 'clearly had the authority not to foreclose.'" (quoting *Carondelet Savings & Loan Assoc. v. Citizens Savings & Loan Assoc.,* 604 F.2d 464, 469 (7th Cir.1979) (alteration in original))). CIBC has failed even to allege that any provision of the MYDFA limits a Bank's discretion to vote for or against an acceleration declaration.

CIBC also has failed to allege that any provision prevents a Bank from refusing to convert its MYDFA debt under the 1992 Financing, nor could it given that CIBC itself chose not to convert the debt it held. Under the terms of Section 11.04(c), "each Bank shall be entitled to protect and enforce its rights arising out of this Agreement." (MYDFA Section 12.12.) CIBC's allegations demonstrate only that BdB took action under contract to protect its rights.

In sum, the Complaint fails to allege a breach of any covenant in connection with the steps taken to prevent acceleration. Plaintiff's allegations charge defendants with nothing more than exercising their rights under the MYDFA; such behavior is not actionable. As explained by another court in this district, the law in New York is clear that

> although the obligation of good faith is implied in every contract, it is the terms of the contract which govern the rights and obligations of the parties. The parties' contractual rights and liabilities may not be varied, nor their terms eviscerated, by a claim that one party has exercised a contractual right but has failed to do so in good faith.

*National Westminster Bank, U.S.A. v. Ross,* 130 B.R. 656, 679 (S.D.N.Y.1991) (citing *Murphy,* 461 N.Y.S.2d at 232, 448 N.E.2d 86), *aff'd,* 962 F.2d 1 (2d Cir.1992) (Table); *see also Hartford Fire,* 723 F.Supp. at 991 ("The mere exercise of one's contractual rights, without more, cannot constitute . . . a breach [of the implied covenant of good faith and fair dealing]." (quoting *Broad v. Rockwell Int'l Corp.,* 642 F.2d 929, 957 (5th Cir.), *cert. denied,* 454 U.S. 965, 102 S.Ct. 506, 70 L.Ed.2d 380 (1981)); *Associates Capital Services Corp. v. Fairway Private Cars, Inc.,* 590 F.Supp. 10, 16 (E.D.N.Y.1982) ("[Defendant] does not breach its duty of good faith and fair dealing by exercising its rights under the contracts."); *In re Bennett,* 154 B.R. 140, 154 (Bankr.N.D.N.Y.1992) (pursuing foreclosure rights under contract cannot be a breach of implied covenant of good faith and fair dealing), *recommendation accepted,* 154 B.R. 157 (N.D.N.Y.1993); *Mutual Life Insurance Co. v. Tailored Woman, Inc.,* 309 N.Y. 248, 254, 128 N.E.2d 401 (N.Y.1955) (defendant, which was "merely exercising its rights," not liable for breach of implied covenant of good faith and fair dealing). Defendants' motions as to Claims Five and Six are granted, and these claims are dismissed.

### F. Claims Seven and Eight: Tortious Interference with Contract

 Plaintiff's two remaining claims can be addressed briefly. These claims allege that the Central Bank and BdB, respectively, tortiously interfered with CIBC's contract with the other party in connection with preventing CIBC from declaring an acceleration of the MYDFA debt. The elements that must be shown to state a claim for tortious interference with contract are: (1) the existence of a valid contract between the plaintiff and a third party; (2) defendant's knowledge of such contract; (3) defendant's intentional procuring of the breach of the contract; and (4) damages. *See Riddell Sports, Inc. v. Brooks*, 872 F.Supp. 73, 77 (S.D.N.Y.1995) (citing *Jews for Jesus, Inc. v. Jewish Community Relations Council, Inc.*, 968 F.2d 286, 295 (2d Cir.1992)).

 CIBC's claims for tortious interference suffer from two fatal flaws, each sufficient to warrant dismissal. First, as discussed above, there has been no breach of contract in relation to CIBC's inability to declare an acceleration of the debt. CIBC argues that a breach of the contract is not a necessary element when it can be shown that the defendant's conduct made plaintiff's performance more difficult or if the benefits of the contract are lessened by the defendant's conduct. For this proposition CIBC cites two cases from this district. The first, *Goodall v. Columbia Ventures, Inc.*, 374 F.Supp. 1324 (S.D.N.Y.1974), stated that a breach was not necessary, but rather that the "tort extends to cases in which performance of the contract is rendered more difficult or a party's enjoyment of the contract's benefits is lessened by the wrongdoer's actions." *Id.* at 1332. *Goodall* was later followed by *Maison Lazard et Compagnie v. Manfra, Tordella & Brooks, Inc.*, 585 F.Supp. 1286, 1290–91 (S.D.N.Y.1984).

These cases, however, which between them fail to cite even one case for support of this proposition,[11] are at odds with clear New York precedent. For example, in *Jack L. Inselman & Co. v. FNB Financial Co.*, 41 N.Y.2d 1078, 396 N.Y.S.2d 347, 364 N.E.2d 1119 (1977), the New York Court of Appeals stated unequivocally that "[i]n order for the plaintiff to have a cause of action for tortious interference of contract, it is axiomatic that there must be a breach of that contract by the other party." *Id.* at 349, 364 N.E.2d at 1120. The court went on to affirm the dismissal because of the lack of this "essential element." *Id.; see also Baylis v. Marriott Corp.*, 906 F.2d 874, 877 (2d Cir.1990) ("Under traditional principles of New York law, a party may not recover for tortious inducement of a breach of contract without proving that the underlying contract has been breached."). Indeed, another court in this district noted that, not only was the holding of *Goodall* contrary to the recent authority, but that Judge MacMahon, the author of *Goodall*, himself subsequently adhered to the view that a breach was a necessary element. *See Nordic Bank PLC v. Trend Group, Ltd.*, 619 F.Supp. 542, 561 (S.D.N.Y.1985) (citing *Strobl v. New York Mercantile Exchange*, 561 F.Supp. 379, 386 (S.D.N.Y.1983)); *see also G.D. Searle & Co. v. Medicore Communications, Inc.*, 843 F.Supp. 895, 910 n. 9 (S.D.N.Y.1994) (recognizing, but not deciding, split in authority created by *Goodall* and *Maison Lazard*). I am inclined, indeed I am bound, to follow the clear rule set out by the New York Court of Appeals and the Second Circuit—because no breach has been alleged as to the acceleration, no claim for tortious interference as to the acceleration can be sustained.

The second flaw in the seventh and eighth claims, despite CIBC's protestations to the contrary, is that the overwhelming weight of authority in New York supports the view that a party to a contract cannot be liable for tortious interference with contractual relations as to that contract. CIBC cites *Kay v. Sussel*, 22 Misc.2d 627, 199 N.Y.S.2d 180 (Sup.Ct.N.Y.Co.1960), which held one party to a contract could be liable for tortiously interfering with another party's performance of that contract. In the instant case, CIBC alleges that the Central Bank interfered with BdB's performance and *vice-versa*. Unfortunately for CIBC, however, the overwhelming weight of authority in New York rejects the approach taken in *Kay* and clearly provides that a party to a contract cannot be held liable in tort for breach of that contract: "It

---

**11.** *Goodall* cites only law review articles, and *Maison Lazard* cites only *Goodall*.

is well established that only a stranger to a contract, such as a third party, can be liable for tortious interference with a contract." *Koret, Inc. v. Christian Dior, S.A.*, 161 A.D.2d 156, 554 N.Y.S.2d 867, 869 (1st Dep't 1990), *appeal denied,* 76 N.Y.2d 714, 564 N.Y.S.2d 718, 565 N.E.2d 1269 (1990) (Table); *see Bernhard v. Dutchess Community College,* No. 80 Civ. 4871, 1982 WL 193, at *12 (S.D.N.Y. Feb. 19, 1982); *Fisher v. Maxwell Communications Corp.,* 205 A.D.2d 356, 613 N.Y.S.2d 369, 370 (1st Dep't 1994); *Bradford v. Weber,* 138 A.D.2d 860, 525 N.Y.S.2d 968, 970 (3d Dep't 1988); *Murphy v. Capone,* 120 A.D.2d 714, 502 N.Y.S.2d 511, 511 (2d Dep't 1986). If the "tortfeasor" is a party to the contract, then the plaintiff's only remedy is an action against that party for breach of contract.[12] *See Albemarle Theatre, Inc. v. Bayberry Realty Corp.,* 27 A.D.2d 172, 277 N.Y.S.2d 505, 508 (1st Dep't 1967) ("In such cases the remedy against the conspiring parties to the contract is an action for breach of contract."); *Warner Bros. Pictures, Inc. v. Simon,* 21 A.D.2d 863, 251 N.Y.S.2d 70, 71 (1st Dep't 1964) ("The defendant parties to the basic contract are not liable in tort; their liability is solely for breach of the contract."), *aff'd,* 15 N.Y.2d 836, 257 N.Y.S.2d 947, 205 N.E.2d 869 (1965). Defendants' motions to dismiss Claims Seven and Eight are granted on this basis as well.

### CONCLUSION

CIBC successfully has asserted causes of action for breach of contract, in Claim One, and for indemnification, in Claim Three. All other claims fail to state a cause of action. Plaintiff is given leave, however, to amend the Complaint as to Claim Two within thirty days of the entry of this Order. The Central Bank's motion to dismiss, therefore, is granted in part and denied in part; the motions to dismiss of BdB and Citibank are granted.

SO ORDERED.

---

12. CIBC's tort claims amount to allegations that the defendants, by their actions taken to prevent acceleration, have deprived CIBC of the fruits of the contract. When levelled against a party to the contract those allegations lie not in a claim for tortious interference, but rather in a claim for breach of the implied covenant of good faith and fair dealing. *See Metropolitan Life,* 716 F.Supp. at 1517. Those claims were addressed, and rejected, above.